**Robert W. BETTS, Plaintiff,**

v.

**RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, Defendants.**

**Civil Action No. 96–0054–C.**

United States District Court,
· W.D. Virginia,
Charlottesville Division.

May 27, 1997.

Dexter Brock Green, Jones & Green, Charlottesville, VA, for Plaintiff.

Richard Croswell Kast, University of Virginia, Office of the General Counsel, Charlottesville, VA, for Defendants.

MICHAEL, Senior District Judge.

Plaintiff Robert W. Betts filed this suit pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, 42 U.S.C. § 1983, and Virginia state law, claiming that Defendants Rector and Visitors of the University of Virginia ("University") violated the ADA, the Rehabilitation Act, his constitutional rights of procedural and substantive due process under the Due Process Clause of the Fourteenth Amendment, and the terms of an alleged contract between defendants and plaintiff. Plaintiff requested preliminary and permanent injunctive relief and attorney's fees.

On September 12, 1996, the court issued a Memorandum Opinion denying plaintiff's request for preliminary injunctive relief against the University. The court recommitted the case to United States Magistrate Judge B. Waugh Crigler for further proceedings consistent with the court's ruling. Following discovery, the parties filed cross motions for summary judgment pursuant to Fed.R.Civ.P. 56. The Magistrate issued a Report and Recommendation on April 30, 1997, in which he recommended that the University's motion be granted and that of plaintiff be denied. Plaintiff filed timely objections, and the court has reviewed the case de novo. For reasons different than those of the Magistrate, the court holds that summary judgment should issue in favor of the University.

## I. FACTUAL BACKGROUND

Discovery in this case has not altered the court's understanding of the pertinent facts in the case, which are almost entirely undisputed (as they were at the preliminary injunction stage). Consequently, the court will rely on its statement of the pertinent facts made in its Memorandum Opinion of September 12, 1996.

Plaintiff was accepted into the University of Virginia's Medical School pursuant to the Medical Academic Advancement Post–Baccalaureate Program ("MAAP"), designed for economically disadvantaged and minority students. MAAP guaranteed admission to the University's Medical School to selected applicants who, *inter alia*, completed MAAP to the University's satisfaction, maintained a minimum grade point average ("GPA") of 2.75 per semester, and received no grade below a C. Plaintiff began the program in the summer of 1995, and continued in the program during the fall semester. He failed to maintain the requisite GPA (he attained a 2.223), and he received a grade below a C in physics (he received a D−). After observing in a letter to plaintiff that "your D− in physics and your overall GPA of 2.2 indicate[ ] . . . that you are not prepared to begin medical school," Pl's. First Compl., Exhibit 4, the reviewing committee nonetheless decided to permit plaintiff to proceed in MAAP, albeit under a modified set of requirements.

The reviewing committee notified plaintiff that if he accepted tutoring and submitted to testing for a learning disability, he would be allowed to continue, pending reevaluation of his performance by the reviewing committee at the end of the academic year. Plaintiff agreed.

Pursuant to the agreement, plaintiff was examined by the University Learning Needs and Evaluation Center ("LNEC"), which issued a preliminary letter to plaintiff's professors on April 12, 1996, stating that plaintiff had "difficulties with short-term memory [and] reading speed." It recommended that plaintiff be given double time for all examinations. Pl.'s First Compl., Exhibit 6. An official report that followed on June 27, 1996, did not diagnose plaintiff with a specific learning disability, but found that plaintiff "had high average verbal conceptual skills and average intellectual ability," but showed "significant weaknesses in particular patterns of abilities." The LNEC concluded that plaintiff lacked "adequate strategies when information exceed[ed] the storage capacity of his short term memory," and that he "demonstrated a pattern of uneven cognitive processing skills consistent with a mild learning disability."

Upon receiving the April 12, 1996 letter, the University immediately doubled the allotted time plaintiff was previously permitted on exams, and he took five exams with the enlarged time; on these five exams, plaintiff received grades in the A or B range. In the spring semester, however, plaintiff attained only a 2.838 GPA, which gave him a cumulative GPA of 2.531 for the year. The other MAAP participants attained the following GPAs for, respectively, the spring and the year: 4.0, 3.4, 3.3, 3.5, 3.6, and 4.0; 3.9, 3.5, 3.2, 3.6, 3.6, and 3.8. On May 28, 1996, the reviewing committee met and decided that plaintiff had failed to demonstrate that he was prepared to enter medical school; consequently, plaintiff's offer of admission was rescinded. Plaintiff was informed that the reviewing committee based its decision on his "failure to meet the overall GPA standard of 2.75 for the academic year." Pl.'s First Compl., Exhibit 7. Plaintiff appealed to the Dean of the Medical School Robert M. Carey

(as he was told he could), and was apprised on June 10, 1996, that the reviewing committee's decision would be upheld. In what appears to be a settlement offer by the University, plaintiff, with his counsel, was given an additional opportunity to appear before Dean Carey, the Admissions Director, and Associate Dean for Admissions. During that meeting (on August 6, 1996), plaintiff was offered another chance to enter into the Medical School,[1] on newly revised terms.[2] Instead of accepting the offer, plaintiff filed this lawsuit on August 9, 1996, and filed his motion for a preliminary injunction on August 14, 1996, seeking entry into the Medical School, whose classes where scheduled to begin on August 19, 1996. The court conducted a hearing on August 15, 1996, and, on August 16, 1996, announced that it would decline to order plaintiff's instatement into the 1996–1997 Medical School class.

## II.   LEGAL ANALYSIS

Plaintiff continues to make the same arguments previously rejected by the court. To avoid reinventing the wheel, the court borrows freely from its September 12, 1996 Memorandum Opinion.

### A.   ADA AND THE REHABILITATION ACT

#### 1.

Of all of plaintiff's claims, those under the ADA and the Rehabilitation Act present the most serious issues. Because of the great substantive similarity between the ADA and the Rehabilitation Act, *see Doe v. University of Maryland Medical System Corp.*, 50 F.3d 1261, 1264 n. 9 (4th Cir.1995), it is appropri-

ate for them to be discussed together. Title II of the ADA provides as follows:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

Section 504   of the Rehabilitation Act states as follows:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).

■   To state a cause of action under Title II of the ADA or § 504 of the Rehabilitation Act, plaintiff must show (1) that he has a disability;[3] (2) that he is an otherwise qualified individual; and (3) that he was denied the benefit at issue on the basis of his disability. *See Maryland Medical System*, 50 F.3d at 1264–65.[4] The parties agree that the first and third criteria are satisfied.

■   The second criterion is the issue of contention. The University argues that plaintiff cannot demonstrate that plaintiff is otherwise qualified to attend the Medical School (or to remain in MAAP). The court agrees. Under the Rehabilitation Act, an "otherwise qualified" individual is "one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S.

---

**1.**   The University's settlement offer cannot be considered by the court in evaluating plaintiff's claims. *See* Fed.R.Evid. 408.

**2.**   Essentially, plaintiff would be required to (1) take an additional twelve credits of course work, in which the University offered to support any request plaintiff made for double time; (2) retake the Medical College Aptitude Test ("MCAT") (again, using double the time allotted non-disabled students if possible); and (3) attain a GPA of 3.25 or better, receive no grade lower than C, and achieve an average score of 8 on the MCAT, with no individual score falling below 7.

**3.**   The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual[,] ... a record of such impairment[,] or ... being regarded as having such an impairment."   42 U.S.C. §§ 12102(2). The Rehabilitation Act includes within its definition of "handicapped individual" precisely the same individuals covered by the ADA's definition of disability. 29 U.S.C. § 706(7), (3).

**4.**   The University concedes it is covered under the ADA and the Rehabilitation Act.

397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). The ADA similarly defines a "qualified individual with a disability" as one who "meets essential eligibility requirements . . . for the participation in [a given] program[ ] . . . provided by a public entity" "with or without reasonable modifications to rules, policies, or practices." 42 U.S.C. § 12131(2). Plaintiff urges that the five examinations which he took after the University doubled his allotted time demonstrate his qualifications to attend the Medical School. Further, plaintiff insists that he satisfied even the University's own requirements by attaining above a 2.75 GPA the second semester.

### 2.

Although rather different from the case at bar, the Second Circuit's opinion in *Doe v. New York University*, 666 F.2d 761 (2d Cir. 1981), is instructive. In that case, the plaintiff was accepted into medical school after misrepresenting that she suffered from no mental problems. Actually, she was plagued with various mental disorders. The medical school subsequently determined that the plaintiff had severe psychological problems and could remain in medical school only if she agreed to undergo therapy. She agreed, but various problems ensued, and ultimately the medical school requested her to leave and refused to readmit the plaintiff. The plaintiff filed suit, seeking preliminary injunctive relief pursuant to the Rehabilitation Act, which the district court granted. The Second Circuit reversed, reasoning as follows:

> In determining whether a handicapped person is 'otherwise qualified' for admission to an institution of higher education, a court must also consider other factors not normally encountered in evaluating ability to satisfy employment standards or to qualify for a job. The first of these is a court's limited ability, as contrasted to that of experienced educational administrators and professionals, to determine an applicant's qualifications and whether he or she would meet reasonable standards for academic and professional achievement established by a university. . . . "Courts are particularly ill-equipped to evaluate academic performance." *Board of Curators of University of Missouri v. Horowitz*, 435

U.S. 78, 92, 98 S.Ct. 948, 956, 55 L.Ed.2d 124 . . . (1978). For this reason, although the [Rehabilitation] Act requires [the court] rather than the institution to make the final determination of whether a handicapped individual is "otherwise qualified," . . . *considerable judicial deference must be paid to the evaluation made by the institution itself,* absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons.

666 F.2d at 775–76 (emphasis added).

■ When addressing discrimination challenges to decisions made by academic institutions, courts have adopted a standard of deference, similar to that approved by the United States Supreme Court in the due process context (*e.g., Regents of University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). *See Wynne v. Tufts University School of Medicine*, 932 F.2d 19 (1st Cir.1991) (holding that "[i]n the context of an 'otherwise qualified-reasonable accommodations' inquiry under the Rehabilitation Act, the [standard articulated in *Ewing*, 474 U.S. at 225, 106 S.Ct. at 513] . . . applies"); *Ellis v. Morehouse School of Medicine*, 925 F.Supp. 1529, 1541–43 (N.D.Ga.1996) (stating that a court should only overturn an academic judgment when the "decision [against the plaintiff] was so arbitrary or irrational as to not constitute an exercise of professional judgment"). In *Doe v. Washington University*, 780 F.Supp. 628 (E.D.Mo.1991), the court granted summary judgment to a university that dismissed the plaintiff, a dental student who had tested positive for human immunodeficiency virus ("HIV"). Rejecting the plaintiff's claims under the Rehabilitation Act, the court held that the university's academic judgment that the plaintiff was no longer qualified to attend the school should be upheld unless "there was no rational basis for the decision or . . . it was motivated by bad faith or ill will." 780 F.Supp. at 631. The court articulated the governing legal standard as follows.

In reviewing the substance of academic decision[s], courts should show great deference to the opinions of educators and normally will not overturn such decisions un-

less they are such 'a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'

*Id.* (quoting *Ewing,* 474 U.S. at 225, 106 S.Ct. at 513).

Ultimately, the court found that the university's action in dismissing the plaintiff was neither arbitrary nor irrational nor done in bad faith, and thus must be allowed to stand. *Id.* at 634.

3.

In this case, plaintiff makes no argument—nor could he—that the University has any intention of discriminating against disabled or handicapped persons.[5] It is equally clear that the University has not established its standards, or applied those standards, with the purpose of denying benefits to disabled or handicapped persons. Rather, on its own initiative, the University suggested that plaintiff be evaluated for a learning disability; upon receiving indication that plaintiff may be disabled, the University immediately agreed to give him double time for all examinations. Only after plaintiff nonetheless failed to meet the MAAP requirements, the University concluded that plaintiff could not enter into its Medical School because he was unprepared to do so.

While plaintiff's performance did improve with the University's reasonable modification (doubling of plaintiff's exam time), the University had to weigh five exams that showed this improvement against a much lengthier, and substantially poorer, record. The five improved examinations were overshadowed by a fall GPA of 2.223, a spring GPA of 2.838, and a cumulative GPA of 2.53 1. Surely no one familiar with the rigors of medical school could argue that a required minimum GPA of 2.75 is "arbitrary" or "irrational." To the contrary, the requirement that students who wish to matriculate into medical school maintain at least a 2.75 GPA is reasonable. Graduates of medical school must assume the grave responsibility of assuming control of another's destiny; thus, medical schools must be permitted the widest discretion to assure that the students who enter are fully competent for such a serious undertaking.

Plaintiff himself offers a concession along these lines: in his memorandum he admits that "this [c]ourt may have correctly concluded that [p]laintiff's *post-accommodation GPA.* ... may not have shown his qualifications for 'the Medical School.' " Pl's. Mem at 26 (emphasis added). Plaintiff argues that he was, however, qualified to continue in MAAP. This argument falls of its own weight. The purpose of MAAP was to qualify plaintiff for Medical School; in deciding to permit plaintiff to remain in MAAP even after he failed to satisfy its requirements, the University stressed that plaintiff's performance indicated a lack of "prepar[ation] to begin *medical school,*" Pl's First Compl., Exhibit 4 (emphasis added), and alerted plaintiff that after he had completed the first portion of MAAP, he would be informed as to whether he would "be allowed to matriculate at the *[Medical] School.*" *Id.* (emphasis added). The focus of the University's inquiry was whether, having failed to meet the standards of MAAP, plaintiff was prepared to go to Medical School. Its academic judgment was that plaintiff was not adequately prepared.

Plaintiff spends a good deal of time making the argument that the University's academic judgment is not entitled to the usual deference because it was based solely on an "objective" criterion. Because the requirement that plaintiff obtain a 2.75 for the academic year is "objective," the argument runs, the court is just as competent as the University to evaluate plaintiff's competency for medical school. The first obvious and ironic problem with the argument is that plaintiff did not, in fact, meet this "objective" criterion. Although plaintiff takes the position that he met the requirement because he attained a GPA above 2.75 his second semester, this stance flies in the face of the facts: the 2.75 GPA was required for both semesters, not just one semester. To accept plaintiff's argument—that the requirement only applied

---

5. This is not to suggest that intent is a prerequisite to ADA liability or to liability under the Rehabilitation Act.

to individual semesters as opposed to the year—would be to contrary to the rules of mathematics: if there is a requirement of 2.75 in the fall, and 2.75 in the spring, inevitably there is a minimum requirement of 2.75 per year. Plaintiff attempts to escape this reality by pressing a waiver argument; the University, plaintiff insists, waived any requirement of an annual 2.75 GPA requirement when the University failed, in the first instance, to evict plaintiff from MAAP when he did not live up to its requirements. Plaintiff offers the court no evidence on waiver; quite the opposite, it is clear from the University's offer to plaintiff that it would fully retain its rights to deny plaintiff admission into the medical school at the conclusion of the second semester at its discretion. No suggestion was made that plaintiff's prior record would be wiped away by the reviewing committee's decision to give plaintiff another chance. Nor is it, as plaintiff urges, logical to assume that the University "must" have agreed to consider only plaintiff's second semester work, because otherwise it would have made no sense for plaintiff to continue in the program. This argument assumes that under no circumstances could plaintiff have achieved a 2.75 GPA for the year if his first semester grades were going to be counted. This assumption is incorrect; plaintiff could have achieved the required 2.75 GPA for the year if plaintiff had earned slightly better grades second semester.[6] The deeper flaw in plaintiff's argument is the unsupported assumption that a clearly defined criterion is entitled to less deference than a vague goal statement would be. Presumably, the number "2.75" represents the outcome of a deliberative process by the academics responsible for developing MAAP. It is entitled to as much deference as any other academic judgment; an "academic judgment" is defined in terms of whether a given judgment sets academic standards, not whether the judgment is numerically expressed.

Finally, plaintiff attacks the University's consideration of his unaccommodated performance along side his accommodated performance. As plaintiff correctly points out, the ADA and the Rehabilitation Act require only that a disabled person be qualified with or without reasonable accommodation (or modification). Looking only at the five exams taken by plaintiff with accommodation, it is undisputed that plaintiff satisfied the MAAP requirements. Plaintiff urges that to include unaccommodated exams in the evaluation of plaintiff's performance is effectively to rewrite the law by eliminating the rule that an individual need not demonstrate qualification without accommodation if he can show qualification with accommodation.

Plaintiff's argument ignores the facts of his case; if the University had available to it a solid record of plaintiff's accommodated performance, this would be a different case. But the evidence of plaintiff's accommodated performance is spotty at best; he can offer the University only five accommodated examinations; the University simply cannot be expected to assess an individual's preparedness for an undertaking as momentous as medical school on the basis of five tests. To emphasize the point, it is helpful to ask whether plaintiff would take the same uncompromising position he now takes if he had only one accommodated exam to offer the University. To this court it is apparent that the University would be forced to weigh plaintiff's accommodated performance against his unaccommodated performance to judge whether he is prepared for medical school. At some stage, the number of accommodated exams rises to a sufficiently large sample so that the University need not (and ought not) refer back to unaccommodated exams. This type of decision must be left largely to the discretion of the University, unless its decision is arbitrary or an abdication of its professional judgment. The University's decision that five exams does not provide sufficient information hardly constitutes a surrender of professional judgment or qualifies as arbitrary.

Therefore, summary judgment must issue in favor of defendants on plaintiff's claims under the ADA and the Rehabilitation Act.[7]

---

6. If plaintiff had earned a GPA of 3.277 second semester, he would have earned a GPA of 2.75 for the year.

7. Plaintiff also argues that defendants violated 34 C.F.R. § 104.7(b), which requires entities cov-

## B. PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAIMS

Plaintiff next claims that even if there was no violation of the ADA and the Rehabilitation Act, the University violated his constitutional rights to procedural and substantive due process guaranteed by the Due Process Clause of the Fourteenth Amendment. Again, the court draws from its Memorandum Opinion of September 12, 1996.

■ Plaintiff's claim asserting procedural due process rights is governed by *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), and its progeny. In *Horowitz,* the Supreme Court declined to address the question whether any constitutionally protected interest (liberty or property) was infringed by a student's dismissal from medical school, but assumed that it was. The Fourth Circuit has not directly addressed the issue, although it too assumed the existence of such an interest. *See Henson v. Honor Committee of U. Va.,* 719 F.2d 69, 73 (4th Cir.1983); *Lewin v. Medical College of Hampton Roads,* 910 F.Supp. 1161, 1164 (E.D.Va.1996) (citing cases). The standard adopted by the Fourth Circuit for evaluating whether there has been a denial of procedural due process depends to some degree on whether the challenged action involves an objective or subjective inquiry. *Siu v. Johnson,* 748 F.2d 238, 244 (4th Cir. 1984). The standard for the latter type of decisionmaking is substantially relaxed. All that is necessary to ensure that a plaintiff has received constitutionally required process is a finding that the decision "was not so arbitrary and capricious that a reviewing court can confidently say of it that it did not in the end involve the exercise of professional judgment." *Id.* at 245.

■ Plaintiff makes the argument that his dismissal involved the evaluation of a single objective criterion, specifically whether he attained a 2.75 GPA or better. As discussed above, this assertion simply cannot be supported. When the reviewing committee informed plaintiff that its decision was based on his failure to meet an overall GPA of 2.75, this decision reflected the subjective professional judgment of the reviewing committee that students performing below that level were unqualified to attend the Medical School.

Plaintiff further contends that even if the reviewing committee's decision was subjective, it was also arbitrary and capricious, because it supposedly imposed a new and unexpected criterion on plaintiff. This is not a tenable argument, even making the assumption that the specific criterion was not previously made known to plaintiff. A judgment that a student who is about to enter medical school should be able to maintain a 2.75 GPA or better is far from arbitrary or capricious; given the great responsibility shouldered by the medical profession, it should hardly surprise anyone—including plaintiff—that grades dangerously close to the C range are unacceptable. Moreover, plaintiffs grades were far below those of all other MAAP participants, none of whom received an average GPA below 3.2 cumulatively, or during the spring semester alone.

■ The same reasoning that compels the conclusion that plaintiff cannot establish a violation of procedural due process on the merits, applies with equal force to his substantive due process claim. Under *Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), substantive due process concerns are raised only by a decision that is "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 225,

---

ered by the Rehabilitation Act to "adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by this part." *Id.* Plaintiff presents no valid argument that any

further grievance procedure would have changed the University's position; in other words, plaintiff does not demonstrate that he was injured by the University's alleged violation of § 104.7(b). Therefore, to the extent plaintiff seriously continues to press this claim, it must fail.

106 S.Ct. at 513. Otherwise, "[p]lainly, [courts] may not override [an academic decision]." *Id.* For the reasons stated in connection with plaintiff's procedural due process claim, defendants made no departure from accepted academic norms.

## C. STATE LAW BREACH OF CONTRACT CLAIM

■ Plaintiff's last theory for recovery is a Virginia state law breach of contract claim. Plaintiff argues that an offer by a university followed by acceptance by a student creates a binding contract between the parties. Although plaintiff concedes that the University would have been justified in rescinding its offer to plaintiff when he failed to meet the minimum GPA requirement for the fall semester (and received a D− in physics), plaintiff argues that the University waived this requirement when it permitted plaintiff to continue in MAAP. Further, plaintiff insists that there was never a requirement that he maintain a 2.75 average for the year, but only per semester, and he met this requirement in the spring semester when he attained a 2.838.

The court has already rejected both of these arguments. Nonetheless, even assuming there never was a minimum GPA requirement for the year, or, alternatively, assuming that the University waived any such requirement by permitting plaintiff to remain in MAAP despite his failure to attain the 2.75 GPA in the fall, the University still did not breach any alleged contract with plaintiff. This is because the University specifically reserved the right to deny plaintiff entry into the Medical School upon reevaluation by the reviewing committee and its judgment that plaintiff was prepared for the Medical School. The University did not deviate from its promised course of action. Given the express reservation by the University and subsequent action consistent with the reservation, plaintiff cannot prevail on his contract claim against the University.

## III. SUMMARY

Based on the reasoning set forth above, the court holds that plaintiff's claims against the University must be dismissed in their entirety. Defendants' motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

An appropriate Order shall this day issue.

## *ORDER*

For the reasons stated in the court's Memorandum Opinion of September 12, 1996 and the accompanying Memorandum Opinion, it is this day

### ADJUDGED AND ORDERED

as follows:

(1) Defendants' motion for summary judgment shall be, and it hereby is, granted.

(2) Plaintiff's motion for summary judgment shall be, and it hereby is, denied.

(3) To the extent the Magistrate's Report and Recommendation of April 30, 1997, recommends that defendants' motion for summary judgment should be granted and that plaintiff's motion for summary judgment should be denied, the recommendation shall be, and it hereby is, accepted.

(4) This case shall be, and it hereby is, dismissed and stricken from the docket of the court.

The Clerk of the Court is hereby directed to send a certified copy of this Order and accompanying Memorandum Opinion to all counsel of record to the Magistrate Judge.