**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 02-1567

ROBERT W. BETTS, II,

Plaintiff - Appellant,

versus

THE RECTOR AND VISITORS OF THE UNIVERSITY OF
VIRGINIA,

Defendant - Appellee.

Appeal from the United States District Court for the Western
District of Virginia, at Charlottesville.  Samuel G. Wilson, Chief
District Judge.  (CA-96-54-3)

Argued:  December 3, 2003          Decided:  August 5, 2005

Before WIDENER and KING, Circuit Judges, and Richard D. BENNETT,
United States District Judge for the District of Maryland, sitting
by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Dexter Brock Green, JONES & GREEN, L.L.P., Charlottesville,
Virginia, for Appellant.  Richard Croswell Kast, Associate General
Counsel and Special Assistant Attorney General, Office of the
General Counsel, UNIVERSITY OF VIRGINIA, Charlottesville, Virginia,
for Appellee.  **ON BRIEF:** Paul J. Forch, General Counsel and Special
Assistant Attorney General, Susan M. Davis, Associate General
Counsel and Special Assistant Attorney General, Office of the
General Counsel, UNIVERSITY OF VIRGINIA, Charlottesville, Virginia,
for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

This case has been argued on three previous occasions in this court and has been decided by written opinion on two of those occasions:  Betts v. The Rector & Visitors, etc., No. 97-1850 (4th Cir. 1999)(unpublished);  and Betts v. The Rector & Visitors, etc., No. 00-2305 (4th Cir. 2001)(unpublished).  It has also been the subject of three published opinions in the district court:  Betts v. Rector & Visitors, etc., 967 F. Supp. 882 (W.D. Va. 1997); Betts v. Rector & Visitors, etc., 113 F. Supp. 2d. 970 (W.D. Va 2000); and Betts v. Rector & Visitors, etc., 198 F. Supp. 2d 787 (W.D. Va. 2002).  We now affirm.

In this appeal, Robert W. Betts challenges the district court's order granting summary judgment to the Rector and Visitors of the University of Virginia on his discrimination claims brought under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213 (2000) and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-797b (1995).  At issue is the University's decision to dismiss Betts from a post-baccalaureate program and revoke a conditional offer to accept him as a student in the University's School of Medicine upon successful completion of the post-baccalaureate program.  We are of opinion that the University afforded Betts a reasonable accommodation within the meaning of the statutes, whether Betts was actually disabled within the meaning of 42 U.S.C. § 12102(2)(A) or perceived to be disabled under 42 U.S.C. §

3

12102(2)(C).  We thus affirm the district court, which held that no causal connection existed between Betts' perceived disability and the University's refusal to grant him admission.


I.

The essential facts are undisputed.  Betts applied to the University's School of Medicine for entry in 1995 and was not admitted but was placed on the alternate waiting list.  As an alternative to the waiting list, the University offered him a spot in its Medical Academic Advancement Post-Baccalaureate program (MAAP Postbacc). The Postbacc program was a one-year program designed to prepare minority and economically disadvantaged applicants for the first year of medical school.  Acceptance into the Postbacc program carried with it admission to the School of Medicine in the class ending in 1996 if that student completed the Postbacc program's requirements, which included maintaining a 2.75 grade-point average and receiving no grade lower than a C. Satisfactory performance was judged by the faculty of the program.

Betts enrolled in that program in the summer of 1995, but he did not meet the minimum requirements.  For the fall semester, he had a 2.2 GPA and received a D- in Physics.  Rather than dismissing Betts, the Postbacc Promotions Committee  allowed him to remain in the program on a probationary basis.  Betts was required to arrange tutoring and to contact the University's Learning Needs and

4

Evaluation Center for testing to determine whether he had a learning disability. The Committee also informed Betts that his performance would be re-evaluated by the Postbacc Promotions Committee following the spring semester.

After conducting a series of tests, the Learning Needs Center concluded in April 1996 that Betts exhibited difficulties with short-term memory and reading speed. This was reported to his professors. Later a more complete evaluation of the same tests showed that Betts demonstrated "high average verbal conceptual skills and average intellectual ability." The evaluation also revealed "significant weaknesses in particular patterns of abilities" and evidence suggesting that Betts "lacks adequate strategies when information exceeds the storage capacity of his short term memory."

The Learning Needs Center recommended that Betts be given twice the allotted time to complete his timed examinations. On his five spring term exams, taken using the double time accommodation, Betts had a 3.5 GPA. However, Betts had taken several of his spring exams prior to receiving the accommodation, and his composite spring GPA was 2.84. Betts' cumulative GPA for the entire year was 2.53.

The Postbacc Promotions Committee then met again and reviewed Betts' record. Basing its decision on Betts' failure to "meet the overall 2.75 GPA standard for the academic year," the Committee

5

voted to drop him from the MAAP Postbacc program and rescind its conditional offer of admission to the entry class of 1996 in the School of Medicine. Betts unsuccessfully appealed the decision to the Dean of the School of Medicine. He then filed this suit.[1]

## II.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1995). Similarly, the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his of her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a) (1999).

The ADA and the Rehabilitation Act are generally construed to impose the same requirements. See Baird ex rel. Baird v. Rose, 192 F.3d 462, 468-69 (4th Cir. 1999). This principle follows from the

---

[1] Betts initially alleged that the University's actions also violated 42 U.S.C. § 1983 and Virginia contract law. In a previous opinion, we affirmed the district court's grant of summary judgment on these claims. See Betts v. The Rector & Visitors of Univ. of Va., No. 97-1850, 1999 WL 739415 (4th Cir. Sept. 22, 1999) (unpublished op.) aff'g 967 F. Supp. 882 (W.D. Va. 1997).

similar language employed in the two acts. It also derives from the Congressional directive that implementation and interpretation of the two acts "be coordinated to prevent[] imposition of inconsistent or conflicting standards for the same requirements under the two statutes." Baird, 192 F.3d at 468 (citing 42 U.S.C. § 12117(b)) (alteration in original).

Thus, to state a cause of action under the ADA or the Rehabilitation Act, Betts must show that (1) he has a disability as defined by the statute; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit on the basis of his disability. Baird, 192 F.3d at 467 (citing Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995)).[2]

III.

In our second decision in this case, Betts v. The Rector & Visitors of Univ. of Va., No. 00-2305 (2001), we decided that Betts was not disabled under the provisions of 42 U.S.C. § 12102(2)(A). In that same decision however, we decided that Betts did have a

_____

[2] While the general requirements of a disability discrimination claim under the ADA and the Rehabilitation Act are the same, the standard of causation is not. 29 U.S.C. § 794 plaintiffs must demonstrate that the discrimination occurred "solely by reason of" their disability. 29 U.S.C. § 794(a). ADA plaintiffs, on the other hand, need only demonstrate that their disability played a motivating role in the discriminatory action. See Baird, 192 F.3d at 468-70. Because Betts has failed to show causation under the more lenient ADA standard, we need not dwell on this distinction.

perceived disability under 42 U.S.C. § 12102(2)(C) so that in order to recover, Betts must prove that the University "mistakenly believe[d] that [he] has a physical impairment that substantially limits his ability to learn."  Slip op. at 6 (alteration in original).  We also recited in that second appeal that our decision was limited to whether or not Betts had a disability under the ADA and that neither party had raised the issue of causation, defined as "whether the University denied Betts benefits because of his disability."  Slip op. at 9 n.2.

On remand, the district court addressed the causation issue, not decided in our second decision.  It decided that Betts had not demonstrated the causal link of his perceived disability to his dismissal from the MAAP Postbacc program.  It held that Betts had been dismissed "solely because Betts failed to meet the objective GPA requirement."  Betts v. Rector & Visitors of Univ. of Va., 198 F. Supp. 2d 787, 798 (W.D. Va. 2002).  The district court did not decide the case on the basis of Eleventh Amendment immunity of the University, rather, on the merits.

From that order Betts appeals.  In this appeal, the University takes the position that the decision of the district court as to causation is correct, but that if not correct, an Eleventh Amendment defense should be considered.

The question of the application of the Eleventh Amendment was raised in the district court, which did not decide the same.

8

Instead, it held that it "need not decide the Eleventh Amendment question, and instead can proceed to the merits." 198 F. Supp. 2d at 791. That the district court was correct in that ruling is illustrated by two recent decisions of the Supreme Court, Idaho v. Coeur D'Alene Tribe of Idaho, 521 U.S. 261 (1997), and Wisconsin Department of Corrections v. Schacht, 524 U.S. 381 (1998). Coeur D'Alene was a case in which the Indian tribe sued the State of Idaho to ascertain the extent of the tribe's ownership in the banks and submerged lands of Lake Coeur D'Alene, various of its tributaries, and streams flowing from the lake. The Court applied the Eleventh Amendment, holding that the Eleventh Amendment barred the suit in the federal court. It held the State of Idaho was entitled to rely on its Eleventh Amendment immunity and to insist upon responding to the claims fo the tribe in the courts of that State. Important to this case is its reasoning:

> Rather, a State can waive its Eleventh Amendment protection and allow a federal court to hear and decide a case commenced or prosecuted against it. The Amendment, in other words, enacts a sovereign immunity from suit, rather than a non-waivable limit on the federal judiciary's subject matter jurisdiction.

521 U.S. 261, 267.

Consistent with that reasoning is the Schacht case, which was a case in which a dismissed prison guard sued the State of Wisconsin Department of Corrections on account of his discharge and, as well, several employees of the Department, both in their personal and official capacities. The action was brought in a

9

state court of Wisconsin, and because Schacht had sued for deprivation of his liberty and property without due process of law, in violation of the federal Constitution and laws, the defendants removed the case to the federal court. The Court considered that Schacht's claims against the officials in their personal capacities were not claims against the State of Wisconsin, rather against them personally. So the Eleventh Amendment defense asserted by the State was permissible as to the Department and officials in their official capacities, but could not be asserted against the officials in their personal capacities. Despite this, the Court held that the removal was permissible and that the district court could hear the claims against the officials in their personal capacities but could not hear the claims against the officials in their official capacities nor against the Department. Its reasoning is much the same as in Coeur D'Alene:

> The Eleventh Amendment, however, does not automatically destroy original jurisdiction. Rather, the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense. Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it.

524 U.S. 381, 389 (citations omitted).

Thus, we conclude, in accordance with Coeur D'Alene and Schacht that the district court was within its authority in proceeding to the merits and in not deciding the Eleventh Amendment question.

10

IV.

A.

We finally consider whether the district court properly awarded summary judgment to the University on causation grounds. We review this issue de novo, construing the facts in the light most favorable to Betts. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Even under the deferential summary judgment standard, however, the record does not support Betts' contention that his disability motivated the University's decision. Furthermore, we believe that the University provided reasonable accommodations to Betts that satisfied applicable statutory mandates, whatever the nature of Betts' disability and whether actual or perceived. In sum, because the record taken as a whole could not lead a rational trier of fact to find for Betts on causation, or failure to accommodate, no genuine issue for trial existed and summary judgment was appropriate. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

As discussed above, ADA plaintiffs must demonstrate that they are (1) "disabled" for purposes of the ADA, (2) otherwise qualified, and (3) discriminated against on the basis of their disability. Baird, 192 F.3d at 467 (citing Doe, 50 F.3d at 1265); see also 42 U.S.C. § 12132 (prohibiting discrimination "by reason of" disability). In No. 97-1850, our first opinion, we held that Betts was otherwise qualified, and in No. 00-2305, we held that he

11

was regarded as disabled under the ADA. As Betts now acknowledges, only the causation prong of <u>Baird</u> has not yet been decided by this court. Br. of Appellant at 12 ("This brings the analysis to the third and final element of an ADA claim, causation.").

It is not even claimed that there is evidence in this case of any intent or motivation on the University's part to discriminate against Betts because of his perceived disability. To the contrary, the record demonstrates that the University dismissed Betts because he did not meet the MAAP Postbacc's objective performance standards. For example, the deposition testimony of Dr. Benjamin Sturgill, chairman of the Promotions Committee, addressed the specific issue of what the Committee considered in its evaluation:

> Q:  All right. And that was the reason the committee decided not to allow him to continue in the program, that his cumulative annual grade point average was below a 2.75?
>
> A:  I think that is a fair assessment of that decision, yes.
>
> Q:  Okay. And that was the only criteria that he hadn't met. There weren't other criteria that he hadn't met?
>
> A:  That's correct.
>
> * * *
>
> A:  We only looked at his grades.
>
> Q:  And when you say his grades, you're talking about his overall grades for that entire semester?

12

        A:    Yes.

JA 107-08, 112.  The other evidence confirms the objectivity of the University's decision.  See, for example, JA 120-127 (Aff. of Dir. of Admissions Beth Bailey); and JA 113-114, a part of the testimony of Dr. Robert Carey, Dean of the Medical College, as to how he decided Betts' appeal from the Committee decision:

    Q:    That's fine.  In making your June 10 decision
          to uphold the decision of the committee
          dismissing him from the program, did you take
          into account the fact that his academic
          performance had significantly improved after
          he had received accommodations --

    A:    Yes.

    Q:    -- sometime in April of 1996?

    A:    Yes.  I have that knowledge, and I did take
          that into account in my decision.

    Q:    Okay.  How did that factor into your
          decision?

    A:    I think it was a matter of trying to make a
          decision about whether he was qualified to
          enter medical school with the information that
          we had at hand at that time, including the
          results of those examinations which occurred
          after accommodation.  And my decision was
          based on the bulk of the evidence as to
          whether he was qualified or not and was really
          based on the bulk of the evidence as to
          whether he was qualified or not and was really
          based on the fact that we had only a few
          examinations in which he had done well during
          accommodation as compared to a very lengthy
          track record during that year of lack of
          success and even beyond that, his academic
          record before he came into the MAAP program,
          although that was a minor factor.

13

> I think the major factor was he had gone through the year, he had not achieved the academic record minimum that we had required, and that with the amount of time and effort that went into that part of it as compared to the few exams that we had at the end, I just didn't feel that the bulk of the evidence was there that he could -- that he was qualified to enter into and be successful.

At this point, we note especially the GUIDELINES FOR IMPLEMENTATION OF POST-BACC PROGRAM:

> 3. If at the end of the second semester of the post-bacc academic year the GPA for either semester falls below the standard, the student will be evaluated by the post-bacc promotions committee who will advise the admissions office as to whether the student should be allowed to continue in the program.

Confronted with the evidence from the faculty members and the Admissions officer, which is supported by Betts' grades, which we do not individually enumerate, Betts argues that the University's decision had the effect of discriminating against him on the basis of his perceived disability.

In light of its well-founded and ADA-benign concerns about Betts' academic record, the end of the MAPP Postbacc program and Betts' imminent matriculation in the medical school, we think that the University had two choices: ignore years of objective evidence, within the MAPP Postbacc program and without, and allow Betts to matriculate based solely on good grades on five tests taken (with double-time) over 18 days; or rely on Betts' entire academic record, particularly his performance in the MAAP Postbacc program, and render its academic judgment. Betts' argument would

14

preclude the Committee from considering, much less choosing, the latter option. We decline to limit the faculty's academic judgment in this fashion. "Courts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement." Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432, 436 (6th Cir. 1998).

B.

In addition to lack of causation, we affirm the judgment of the district court on the alternate ground that the University provided Betts with the reasonable accommodation required by the ADA and the Rehabilitation Act, regardless of the nature of his disability. Indeed, a listing of the University's accommodations requires our conclusion:

1.     Placing Betts on the Alternate List rather than rejecting outright his application;

2.     Offering Betts admission into the MAPP Postbacc program;

3.     Allowing Betts to remain in the MAAP Postbacc program after his fall semester GPA of 2.2 fell below 2.75 and after he had earned a grade below a C;

4.     Initiating Betts' testing for a learning disability, and allowing Betts to stay in the MAAP program, one reason being that testing could be had at no cost to Betts;

15

5. Providing Betts with individualized help from Learning Needs Center tutors and staff during the spring semester;

6. Granting Betts regular meetings with a faculty adviser during the spring semester;

7. Allowing Betts double-time on the five exams from April 12 to April 30, 1996; and

8. Offering Betts even another admission to the medical school in the matriculating class of 1997, contingent upon the completion of another year of, and improved, course work and improved MCAT scores.

Instead of accepting the last offer, Betts brought this suit three days thereafter.

It is true, of course, that the first two accommodations listed above were put in place before any formal indication of Betts' learning impairment (or perception of disability) surfaced. But the other six accommodations, particularly the University's initiating and insistence on testing for Betts and, at the same time, allowing him to remain in the program despite his fall-semester grades, at least partly to allow him to obtain testing at no personal cost, represented the University's ongoing and more-than-reasonable efforts to help Betts attain admission to the medical school despite his academic troubles.

We are especially persuaded by the University's final accommodation to Betts, which demonstrated its stated desire to

16

give Betts more time to demonstrate his capabilities with accommodation. The district court, in 967 F. Supp. 882, 885 n.1, refused to consider this accommodation because it determined it to be a settlement offer under Fed. R. Evid. 408. We are of opinion that when, as here, the question to be decided is whether an offer of accommodation has been made, the fact that the same offer may be considered one of settlement or accommodation does not make it inadmissible. So we consider the offer.

The only conclusion permitted by the record is that the University wanted Betts to matriculate right up until the end. Indeed, we find it noteworthy that not once (until his dismissal) did the University deny Betts any help or accommodation he sought. But once the University decided to discontinue the MAAP Postbacc program in its same form (a decision unrelated to Betts), it simply ran out of ways to accommodate Betts short of suspending its academic judgment. Even at that late point, the University devised a last way to accommodate Betts consistent with its principles.

We need not here demarcate what accommodations are reasonable in every case involving the ADA or academic institutions. Considering these facts, we hold simply that the University made all reasonable accommodations consistent with its fundamental educational judgment, its duty to the medical profession, and its obligation to the Commonwealth. See Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 26 (1st Cir. 1991) (en banc) ("[T]he issue of

17

whether the facts alleged by a university support its claim that it has met its duty of reasonable accommodation will be a purely legal one. Only if essential facts were genuinely disputed or if there were significantly probative evidence of bad faith or pretext would further fact finding be necessary.") (citation and quotation omitted). There is no bad faith or pretext on the part of the University in this case.

In reaching this fact-bound conclusion, we emphasize that we do not decide one issue briefed by the parties and reached by the district court. In No. 00-2305 we held that Betts was not actually disabled but was regarded as disabled. The parties dispute whether the ADA's accommodation requirement applies with equal force to a "regarded as" disabled plaintiff. The district court suggested that it does not.

This question has not been decided by this circuit, and our sister circuits are divided on the issue. Compare <u>Weber v. Strippit, Inc.</u>, 186 F.3d 907, 916-17 (8th Cir. 1999), <u>cert. denied</u>, 528 U.S. 794 (2000) and <u>Shannon v. New York City Transit Auth.</u>, 332 F.3d 95, 104 n.3 (2d Cir. 2003) ("It is not at all clear that a reasonable accommodation can ever be required in a 'regarded as' case (such as this one) in which it is undisputed that the plaintiff was not, in fact, disabled.") with <u>Katz v. City Metal Co.</u>, 87 F.3d 26, 33-34 (1st Cir. 1996) (stating that "Katz established that City Metal regarded him as having an impairment

18

constituting a disability under section 12102(2)(c) of the Act"). We think that the extensive accommodations actually offered by the University are sufficient under either theory, so we express no opinion on that question.

V.

Because the record as a whole demonstrates that a rational trier of fact could not find for Betts on the causation element of his claim, and neither could a fact finder find that Betts was not reasonably accommodated in all events, the district court properly granted the University's motion for summary judgment.

The judgment of the district court is accordingly

AFFIRMED.