John DOE, Plaintiff–Appellant,

v.

UNIVERSITY OF MARYLAND MED-
ICAL SYSTEM CORPORATION,
et al., Defendants–Appellees.

No. 94–1462.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 30, 1995.

Decided April 3, 1995.

**ARGUED:** Trent Mitchell Kittleman, Jeanine Marie Worden, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for appellant. Peter Edward Keith, Gallagher, Evelius & Jones, Baltimore, MD, for appellees. **ON BRIEF:** Julie Ellen Squire, Gallagher, Evelius & Jones, Baltimore, MD, for appellees.

Before WILKINSON, WILKINS, and LUTTIG, Circuit Judges.

Affirmed by published opinion. Judge WILKINS wrote the opinion, in which Judge WILKINSON and Judge LUTTIG joined.

## OPINION

WILKINS, Circuit Judge:

John Doe, M.D. (Dr. Doe) appeals a decision of the district court granting summary judgment to University of Maryland Medical System Corporation (UMMSC)[1] on his claims under § 504 of the Rehabilitation Act, 29 U.S.C.A. § 794 (West Supp.1994), and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C.A. § 12132 (West Supp. 1994). The district court reasoned that Dr. Doe, who is a carrier of the human immunodeficiency virus (HIV), is not an otherwise "qualified individual" with a disability. Because we agree with the district court that Dr. Doe poses a significant risk to patients at UMMSC that cannot be eliminated by reasonable accommodation, we affirm.[2]

I.

A.

The material facts are undisputed. When the events leading to this lawsuit began to unfold, Dr. Doe was a neurosurgical resident at UMMSC in the third year of a six-year training program. In January 1992, Dr. Doe was stuck with a needle while treating an individual who may have been infected with HIV, the virus which causes Acquired Immune Deficiency Syndrome (AIDS).[3] Dr. Doe subsequently tested positive for HIV.[4] Upon learning that Dr. Doe was HIV-positive, UMMSC suspended him from surgery pending a recommendation of its panel of experts on blood-borne pathogens. The panel recommended that Dr. Doe be allowed to return to surgical practice with the exception of certain specific procedures involving the use of exposed wire, which the panel deemed to involve too great a risk of transmission of HIV to patients. In addition, the panel suggested that certain restrictions be placed on Dr. Doe, including requirements that he rigorously follow infection control procedures; that if Dr. Doe's blood ever contacted a patient's non-intact skin he notify his supervisor, UMMSC's Infection Control Office, and the patient; and that Dr. Doe provide a specimen of his blood so that in the event a patient claimed to have contracted HIV from Dr. Doe, the DNA of the two viruses could be compared. However, the panel did not recommend that Dr. Doe be required to obtain the informed consent of his patients before performing surgical procedures.

After careful consideration and further study, senior administrators at UMMSC rejected the recommendations of the panel. Instead, UMMSC permanently suspended

1. Dr. Doe brought suit against UMMSC and several of its senior administrators in their official capacities. We refer to Appellees collectively as UMMSC.

2. Dr. Doe also appeals the decision of the district court granting summary judgment to UMMSC on his claim under the Equal Protection Clause of the United States Constitution. We review this matter separately below.

3. HIV weakens the body's immune system, rendering the infected individual susceptible to disease. AIDS is the end-stage of HIV infection and is characterized by the presence of HIV and one or more "opportunistic" infections, i.e., diseases that occur only rarely in individuals who do not carry HIV. Infection with HIV is invariably fatal. However, years may pass before an HIV-positive individual develops AIDS; such persons are considered "asymptomatic" for AIDS. When the events relevant to this lawsuit occurred, Dr. Doe was HIV-positive but asymptomatic for AIDS.

4. It is unknown whether Dr. Doe acquired HIV from the needle stick or from exposure at some previous time.

Dr. Doe from surgical practice and offered him alternative residencies in non-surgical fields. After Dr. Doe refused the alternative residencies and insisted that he be reinstated with full surgical privileges, UMMSC terminated him from its residency program.

### B.

HIV is a fragile virus that may be transmitted only through certain bodily fluids, including blood. One way in which HIV may be transmitted is through blood-to-blood contact with infected blood. Thus, it is possible that a patient could contract HIV from a surgeon who is HIV-positive. For example, a surgeon might sustain a cut from a sharp instrument which causes him to bleed directly into a patient's open wound during an invasive surgical procedure. Or, a surgeon might be stuck with a needle which is then used on a patient to start an intravenous line or to suture a wound.[5]

Although estimates of the risk of surgeon-to-patient transmission vary, there is general agreement among public health officials that the risk is small. For example, the Centers for Disease Control and Prevention (CDC) has estimated that the risk to a single patient from an HIV-positive surgeon ranges from .0024% (1 in 42,000) to .00024% (1 in 417,000). Centers for Disease Control, U.S. Dep't of Health & Human Servs., *Open Meeting on the Risks of Transmission of Blood-borne Pathogens to Patients During Invasive Procedures* (Feb. 21–22, 1991) (statement of Dr. David Bell, Centers for Disease Control). However, the CDC also estimated that the cumulative risk of transmission by an HIV-positive surgeon during the course of his career ranges from .8%–8.1%. *Id.*

In reaching its decision to terminate Dr. Doe, UMMSC considered recommendations issued by the CDC regarding HIV-positive health care workers (HCWs). *See* Centers for Disease Control, U.S. Dep't of Health & Human Servs., *Recommendations for Pre-*

venting Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure–Prone Invasive Procedures, 40 Morbidity & Mortality Weekly Report 1, 3–4 (July 12, 1991) (CDC Recommendations). In light of its determination that the risk of HCW-to-patient transmission of HIV is at most a small one, the CDC recommended that HIV-positive HCWs should not be barred from performing most surgical procedures. *See id.* at 5. Instead, the CDC recommended strict adherence to "universal precautions" for infection control. *Id.* These precautions include hand-washing, wearing of protective barriers such as gloves and masks, and care in the use of needles and other sharp instruments. *Id.* Provided that the universal precautions are followed, the CDC concluded that "[c]urrently available data provide no basis for recommendations to restrict the practice of HCWs infected with HIV ... who perform invasive procedures." *Id.*

However, the CDC distinguished between the large class of invasive procedures (ranging from insertion of an intravenous line to most types of surgery) and a more limited class of "exposure-prone" procedures, *i.e.*, those posing a greater risk of percutaneous (skin-piercing) injury to the surgeon. Although the CDC did not attempt to specifically identify exposure-prone procedures, it did provide a general definition of the term:

> Characteristics of exposure-prone procedures include digital palpation of a needle tip in a body cavity or the simultaneous presence of the HCW's fingers and a needle or other sharp instrument or object in a poorly visualized or highly confined anatomic site. Performance of exposure-prone procedures presents a recognized risk of percutaneous injury to the HCW, and—if such an injury occurs—the HCW's blood is likely to contact the patient's body cavity, subcutaneous tissues, and/or mucous membranes.

---

5. However, there is to date no documented case of an HIV-positive surgeon transmitting the virus to a patient, even though there are a number of known cases of HIV-positive surgeons operating on patients. *See* Centers for Disease Control, U.S. Dep't of Health & Human Servs., *Recom-* mendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure–Prone Invasive Procedures, 40 Morbidity & Mortality Weekly Report 1, 3–4 (July 12, 1991).

*Id.* at 4. The CDC further recommended that individual health-care organizations should identify which procedures performed at their facilities are exposure prone, and should determine whether, and under what circumstances, HIV-positive HCWs should perform such procedures. *Id.* at 5 & n.*. UMMSC determined that most or all of the procedures Dr. Doe would perform as a neurosurgical resident fit within the CDC's definition of exposure-prone procedures and that Dr. Doe should, consistent with the CDC Recommendations, be prevented from performing them.

UMMSC also considered a study of percutaneous injuries to HCWs during surgical procedures (the Tokars study), which concluded that such injuries are common, occurring in approximately 6.9% of all surgeries. The Tokars study also found that "recontacts"—contact with a patient's tissues from an instrument that had previously injured an HCW—were common, particularly when suturing a wound.[6] Based on this study, UMMSC concluded that a very real possibility existed that Dr. Doe could be injured during a surgical procedure and that patients could thereby be exposed to his blood.

Shortly after he was terminated, Dr. Doe filed this lawsuit claiming that UMMSC had discriminated against him in violation of § 504 of the Rehabilitation Act, Title II of the ADA, and the Equal Protection Clause of the Fourteenth Amendment. Dr. Doe also alleged retaliation in violation of the Rehabilitation Act and the ADA, breach of contract, and invasion of privacy. He requested injunctive relief, a declaratory judgment that UMMSC had violated the Rehabilitation Act and the ADA, and compensatory and punitive damages. In an interlocutory order, the district court dismissed Dr. Doe's prayers for compensatory and punitive damages under the Rehabilitation Act and Title II of the ADA and also dismissed his retaliation claims. After extensive discovery, the parties moved for summary judgment.

The district court granted summary judgment to UMMSC, concluding that as a matter of law Dr. Doe was not entitled to relief under the Rehabilitation Act, the ADA, and the Equal Protection Clause. The district court also dismissed without prejudice Dr. Doe's state-law claims for breach of contract and invasion of privacy and denied his motion to amend his complaint.

## II.

■ Dr. Doe primarily argues that the district court erred in granting summary judgment to UMMSC on his claims under § 504 of the Rehabilitation Act and Title II of the ADA. Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794,[7] and Title II of the ADA, 42 U.S.C.A. § 12132,[8] prohibit discrimination against an otherwise qualified individual with a disability.[9] In order to establish a

---

**6.** Dr. Doe challenges the conclusions of the Tokars study, arguing that the study is inaccurate and inconclusive because it did not attempt to analyze the amount of blood-to-blood contact resulting from percutaneous injuries. Therefore, Dr. Doe asserts, the Tokars study does not address the risk of transmission of HIV from HCWs to patients. While we agree with Dr. Doe that the Tokars study does not attempt to quantify the risk of transmission of HIV from an infected HCW to a patient during surgery, such a quantification was not the purpose of the study. The Tokars study simply demonstrates that percutaneous injuries—which create a risk of HIV transmission—do occur during surgical procedures.

Dr. Doe also argues that the Tokars study is irrelevant because it did not include neurosurgical procedures. However, the Tokars study concluded that the majority of percutaneous injuries occur during the suturing of wounds—a practice common to neurosurgery.

**7.** The Rehabilitation Act provides, in pertinent part:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C.A. § 794(a) (West Supp.1994).

**8.** Title II of the ADA provides, in pertinent part:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C.A. § 12132. The parties do not dispute that UMMSC is a "public entity" subject to the provisions of Title II of the ADA.

**9.** Because the language of the two statutes is substantially the same, we apply the same analysis to both. *Cf.* 42 U.S.C.A. § 12133 (West Supp.

violation of either of these statutes, a plaintiff must prove: (1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability. *See Gates v. Rowland*, 39 F.3d 1439, 1445 (9th Cir.1994). Regarding the second requirement, an individual is not otherwise qualified if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation. *See* 29 U.S.C.A. § 706(8)(D) (West Supp.1994); 42 U.S.C.A. §§ 12111(3), 12113(a)–(b) (West Supp.1994).

The parties do not dispute that infection with HIV is a disability; that were Dr. Doe not HIV-positive, he would be qualified to continue his employment as a neurosurgical resident at UMMSC; and that Dr. Doe's residency was terminated because he is HIV-positive. However, UMMSC maintains that its decision to terminate Dr. Doe was not discriminatory because he poses a significant risk to the health or safety of its patients that cannot be eliminated by reasonable accommodation and therefore is not an otherwise qualified individual with a disability.

■ The Supreme Court addressed the question of when an individual with a contagious disease is otherwise qualified in *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). The *Arline* Court stated that an individual with an infectious disease is not otherwise qualified under § 504 of the Rehabilitation Act if he "poses a significant risk of communicating an infectious disease to others … [and] reasonable accommodation will not eliminate that risk." *Arline*, 480 U.S. at 287 n. 16, 107 S.Ct. at 1131 n. 16.[10] The Court articulated a four-prong test to be used in determining whether an individual poses a significant risk to the health or safety of others:

(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Id.* at 288, 107 S.Ct. at 1131 (internal quotation marks omitted). Thus, in the words of the district court below, the *Arline* factors "discount[ ] the severity of anticipated harms by the statistical probability that they will occur." *Doe v. University of Md. Medical Sys. Corp.*, C/A No. 92–2832 (D.Md. Mar. 31, 1994) (order granting summary judgment). Because the only issue before us with respect to Dr. Doe's claims under § 504 of the Rehabilitation Act and the ADA is whether the undisputed facts establish the existence of a significant risk that cannot be eliminated by reasonable accommodation, our review is de novo. *See Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).

UMMSC argues that Dr. Doe poses a significant risk because (1) HIV may be transmitted via blood-to-blood contact in a surgical setting; (2) Dr. Doe will always be infectious; (3) infection with HIV is invariably fatal; and (4) there is an ascertainable risk that Dr. Doe will transmit the disease during the course of his neurosurgical residency. Moreover, UMMSC asserts, the risk of injury from needles and other sharp instruments cannot be eliminated through reasonable accommodation; therefore, neither can the risk of infection. In short, UMMSC contends that the catastrophic effects of infection with HIV combined with a minimal but nevertheless ascertainable risk of transmission form a sufficient basis upon which to conclude that Dr. Doe is not otherwise qualified for a residency in neurosurgery.

Dr. Doe does not dispute that the first three *Arline* factors weigh in favor of a finding that he poses a significant risk. And, Dr. Doe cannot seriously claim that he will never suffer a needle stick or scalpel cut that might

1994) (incorporating "remedies, procedures, and rights" of 29 U.S.C.A. § 794a (West Supp.1994) into Title II of the ADA).

**10.** Similarly, under the ADA a disabled individual is not otherwise qualified if he poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C.A. § 12111(3).

lead to infection of a patient with HIV throughout his residency. Rather, Dr. Doe argues that the risk that he will transmit HIV to one of his patients is so infinitesimal that it cannot, regardless of the degree of harm involved, be considered a significant risk. As support for his contention, Dr. Doe points to the CDC Recommendations and to the admonition of the Supreme Court in *Arline* that "courts normally should defer to the reasonable medical judgments of public health officials." *Arline,* 480 U.S. at 288, 107 S.Ct. at 1131; *cf. Doe v. Attorney General of the U.S.,* 941 F.2d 780, 798 n. 27 (9th Cir.1991) (referring to the CDC and the Surgeon General as public health officials). Dr. Doe claims that only one neurosurgical procedure—a spinal fusion involving wire—qualifies as exposure prone under the CDC Recommendations and that therefore, consistent with the CDC Recommendations, he should be permitted to perform all other invasive procedures. Dr. Doe further asserts that a restriction on performing spinal fusions involving wire and adherence to universal precautions are reasonable accommodations that will eliminate any significant risk of transmission of HIV to his patients.

Dr. Doe is correct that *Arline* urges us to defer to the reasonable medical judgment of public health officials. The CDC is such a public health official, and its reasonable medical judgment as contained in the CDC Recommendations is the only judgment of a public health official that was presented to the district court. However, we must consider the CDC's suggestion that HIV-positive surgeons should be allowed to practice invasive procedures in light of its further recommendation that hospitals may bar HIV-positive surgeons from performing those procedures identified *by the hospital* as exposure prone. After careful consideration of the CDC Recommendations and other sources of information, UMMSC concluded that all neurosurgical procedures that would be performed by Dr. Doe fit the definition of exposure-prone procedures, and restricted his practice accordingly. We are reluctant under these circumstances to substitute our judgment for

that of UMMSC. The types of procedures in which Dr. Doe is engaged as a neurosurgical resident are not so clearly outside the characteristics of exposure-prone procedures identified by the CDC that we can conclude that deference to public health officials requires us to decide that Dr. Doe does not pose a significant risk.

■ We hold that Dr. Doe does pose a significant risk to the health and safety of his patients that cannot be eliminated by reasonable accommodation. Although there may presently be no documented case of surgeon-to-patient transmission, such transmission clearly is possible. And, the risk of percutaneous injury can never be eliminated through reasonable accommodation. *Cf. Bradley v. University of Texas M.D. Anderson Cancer Ctr.,* 3 F.3d 922, 925 (5th Cir.1993) (per curiam) (noting impossibility of eliminating risk of percutaneous injury to surgical technician through reasonable accommodation because to do so would eliminate essential functions of employment), *cert. denied,* — U.S. —, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994). Thus, even if Dr. Doe takes extra precautions (such as wearing two pairs of gloves, making stitches with only one hand, and using blunt-tipped, solid-bore needles) some measure of risk will always exist because of the type of activities in which Dr. Doe is engaged. We therefore conclude that Dr. Doe is not an otherwise qualified individual with a disability under § 504 of the Rehabilitation Act and the ADA. *See id.* at 924.

The record before us demonstrates that UMMSC's decision to terminate Dr. Doe was thoroughly deliberated. UMMSC carefully reviewed the recommendations of the panel on blood-borne pathogens, which in turn considered all then-current knowledge of the transmissibility of HIV in the health-care setting. In spite of the low risk of transmission, UMMSC made a considered decision to err on the side of caution in protecting its patients. And, there is nothing in the record to indicate that UMMSC acted with anything other than the best interests of its patients and Dr. Doe at heart.[11]

---

11. In fact, UMMSC appears to have acted with great sensitivity to the extremely difficult situa-

tion faced by Dr. Doe. Evidence in the record indicates that UMMSC gratuitously continued to

### III.

Dr. Doe also claims that the district court erred in granting summary judgment to UMMSC on his equal protection claim. Dr. Doe asserts that he is a member of the class of HIV-positive HCWs at UMMSC; that only those HIV-positive HCWs whose status is known to UMMSC are restricted from performing invasive procedures; and that the differential treatment of HIV-positive HCWs based on whether the infection is known or unknown is violative of the Equal Protection Clause.

 Classifications involving individuals with disabilities are subject only to rational basis scrutiny. *See Contractors Ass'n of E. Pa., Inc. v. Philadelphia,* 6 F.3d 990, 1001 (3d Cir.1993); *see also Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 442–47, 105 S.Ct. 3249, 3255–58, 87 L.Ed.2d 313 (1985). Thus, UMMSC's alleged unequal treatment of HIV-positive HCWs whose status is known or unknown "is presumed to be valid and will be sustained if the classification . . . is rationally related to a legitimate state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. As a matter of simple logic, UMMSC cannot be expected to restrict the activities of HIV-positive HCWs when it does not know who those individuals are. We therefore conclude that UMMSC's decision to restrict the activities of only those HCWs whose HIV-positive status is known is rationally related to the unquestionably legitimate interest of protecting the health of its patients.

### IV.

We hold that a hospital does not violate § 504 of the Rehabilitation Act or Title II of the ADA when it terminates an HIV-positive neurosurgical resident based upon the risk of transmission of the disease during performance of exposure-prone procedures. Such

individuals pose a significant risk to the health or safety of their patients that cannot be eliminated by reasonable accommodation, and therefore are not otherwise qualified within the meaning of the Rehabilitation Act and the ADA. Accordingly, we affirm the decision of the district court.[12]

*AFFIRMED.*

---

pay Dr. Doe's salary during negotiations between the parties; offered Dr. Doe alternative residencies in pathology and psychiatry; and attempted to secure Dr. Doe a position on the UMMSC faculty upon completion of his residency.

12. Dr. Doe also appeals the decisions of the district court denying his motion to amend his complaint and dismissing his prayers for compensatory and punitive damages under § 504 of the Rehabilitation Act and Title II of the ADA. However, these allegations of error are moot in light of our determination that Dr. Doe is not an otherwise qualified individual under the Rehabilitation Act and the ADA.