Juan **SERRANO**, Jr., Plaintiff,

v.

**COUNTY OF ARLINGTON,** Defendant.

C.A. No. 97–150–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 26, 1997.

Margaret Winslow Reed, Carolyn P. Carpenter, Darrel Tillar Mason, Carpenter & Woodward, PLC, Richmond, VA, for Plaintiff.

Dana L. Rust, Carol N. Brown, McGuire Woods Battle & Boothe, LLP, Richmond, VA, John J. Michels, Jr., McGuire Woods Battle & Boothe, LLP, McLean, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This ADA[1] action presents a question not yet settled in this circuit, namely whether a job applicant can claim to be "regarded as" disabled under the Act when a prospective employer considers the applicant as physically unfit only for a specific job, but not for a broad range or class of jobs. In the particular circumstances of this case, the question is whether an applicant for a county firefighter position is "regarded as" disabled within the meaning of the Act where the county considers the applicant, who has a history of back injuries, unsuited for work as a firefighter, but not unsuited for a wide range of other jobs.

### I.

The dispositive facts are essentially undisputed. Plaintiff, an applicant for a position with the Arlington County Fire Department, has a history of back problems. In the fall of 1984, at the age of 17, plaintiff hurt his back while playing basketball. After experiencing pain in his back and numbness in his legs, tests revealed that plaintiff had herniated a disc at the L3–L4 level, and a micro-lumbar laminectomy was performed on November 5, 1984. Seven months after the operation, plaintiff again experienced pain in his back and numbness in his legs. Tests performed by plaintiff's physician, Dr. Richard McAdam, revealed that plaintiff had spinal stenosis, a narrowing of the neural canal.[2] Further, a lumbar myelogram[3] disclosed a second herniated disc, this time at the L4–L5 level.[4] Dr. McAdam prescribed a physical

---

1. Americans with Disabilities Act ("ADA" or "Act") of 1990, 42 U.S.C. § 12101 *et seq.*

2. According to Dr. McAdam, this narrowing could cause a person to experience more pain in the event of a disc herniation than one would experience without the condition. Further, according to Dr. Leo Van Herpe, an expert designated by the County to testify at trial, this narrowing places a patient at an increased risk of herniating a disc because the spinal roots have very little room in which to escape the pressure of a protruding disc.

3. A myelogram is a diagnostic study of the spine accomplished by performing a spinal tap, injecting dye into the spine and taking X-rays of the spine from different angles.

4. From his deposition, it appears that Dr. McAdam is unsure whether or not plaintiff suffered a second herniated disc. Yet, whether or not plaintiff actually suffered a second herniated disc is immaterial, for the medical records, on which the County reasonably relied in evaluating plaintiff, unequivocally reflect that plaintiff had a second herniated disc.

therapy rehabilitation program which, among other things, included instructions to plaintiff to refrain from attempting to lift weights from the floor. Because plaintiff's condition improved under the physical therapy regimen, Dr. McAdam concluded that further surgery was unnecessary.

But this was not the end of plaintiff's back problems; he experienced further problems triggered by various sporting accidents. In March 1989, while a member of the varsity baseball team at Virginia Commonwealth University, plaintiff was involved in a biking accident which caused pain in his back and legs. The physician who treated him for this injury assessed plaintiff as suffering from sciatica, a condition characterized by leg pain and often indicative of spinal nerve irritation. Dr. McAdam agrees that sciatica can be a symptom of an L4–L5 disc herniation.

In December 1991, plaintiff experienced another basketball mishap, similar to the accident which triggered his original back problems. As a result, plaintiff admitted himself to an emergency room complaining of severe pain in his back, right buttocks, right calf area, and the outside part of his foot. The record reflects that all of these complaints are consistent with sciatica.

Despite plaintiff's history of injuries, it does not appear from the record that his back conditions limit or restrict him in his routine day-to-day activities. But the record does reflect that plaintiff's back condition limits his heavy lifting ability. Specifically, Dr. McAdam stated in his deposition that while lifting 100 pounds would be reasonable for plaintiff, 160–200 pounds would place a "large strain on his back," and even 150 pounds would be "pushing the envelope of what [he] call[ed] safety." Dr. McAdam did not think plaintiff could routinely lift 150 pounds, and noted that "200 ... [pounds would be] prohibitive."

Nor are the consequences of plaintiff's back condition limited to lifting restrictions. Particularly significant here is that his back condition carries with it an increased risk of re-injury. Specifically, the physicians in this case agree that a laminectomy on a herniated disc provides no guarantee against re-injury. Individuals who undergo the procedure still face, initially, a 10% chance of re-injuring the same disc, although the risk of reoccurrence diminishes over time. Because of this re-injury rate, individuals who have suffered a herniated disc in the past are, as compared with persons with no prior disc herniations, more likely to suffer a herniated disc in the future. Although it is impossible to predict whether and when such an injury will occur, there is no dispute that heavy lifting is often a precipitating cause of such a re-injury. Also undisputed is that while the consequences of a herniated disc vary, incapacitating pain, loss of reflexes, and loss of strength are typical.

Plaintiff first learned of the firefighter vacancies through an advertisement on a local cable television program. He responded and received from the County a packet of materials, including a written application and a self-screening form.[5] He completed the application form on June 10, 1994, and shortly thereafter, commenced a multi-step screening process. First, applicants are required to pass a written test. Next, applicants must be interviewed and ranked by a panel of three Fire Department employees. The next step in the process is a physical agility test.[6] Thereafter, successful applicants are personally interviewed by the Chief of the Fire Department. If the applicant passes all steps, he or she receives an offer of employment conditioned upon the applicant passing

5. The County's self-screening form, which is no longer in use, was designed to alert potential firefighter candidates to existing physical conditions that might preclude employment. The form noted that candidates who had suffered from a herniated disc, back or spinal disorder, epilepsy, or a heart murmur, among other maladies, would be disqualified. The form also noted, however, that it was not an official part of the application, and was not required to be submitted as part of the application. In any event, the form did not dissuade plaintiff from submitting an application.

6. The physical agility test measures the applicant's ability to perform certain job-related tasks. It simulates, in a controlled environment, the principal duties of a firefighter, namely, a hose drag, a hose hoist, a ladder climb and a rescue of a 125 pound dummy. All of these tasks must be carried out in full gear.

a medical examination and background check.

Plaintiff successfully completed the written test, the panel interview, and the physical agility test, and accordingly, received an interview with the Chief of the Fire Department, Chief Plaugher. During the interview, when asked whether he had any "old baseball injuries," plaintiff forthrightly informed Chief Plaugher about the surgery in 1984 for his herniated disc. Notwithstanding this new discovery, Chief Plaugher extended plaintiff a written offer of employment expressly conditioned on plaintiff passing the medical examination and the background check.

A comprehensive medical examination of plaintiff, conducted by a County nurse practitioner on October 11, 1994, included, among other things, vision and hearing testing, a blood test, a stress test, chest x-rays and a drug screen. As part of the medical examination, plaintiff was also required to complete a detailed occupational health questionnaire, and execute an authorization for the County to obtain all medical documentation related to his back problem. After completion of this examination, plaintiff's history of herniated discs was the County's sole health-related concern. In this regard, Dr. Linda Hedlund, the supervising physician for the County's Occupational Health Clinic reviewed plaintiff's records to determine whether plaintiff could safely perform the essential duties of a firefighter.[7] Reference to the County's Medical Standards,[8] and her own knowledge of the duties of a County firefighter guided Dr. Hedlund's assessment. Based on her review of plaintiff's medical history, and the job requirements of a firefighter, Dr. Hedlund determined that plaintiff was unsuited for the position. She called her supervisor, Dr. Susan Allan, the Division Chief of the Public Health Division for Arlington County, to discuss her opinion. Dr. Allan concurred with Dr. Hedlund's assessment, noting that plaintiff could not safely perform the essential functions of a firefighter. Specifically, Dr. Allan noted that,

> [W]ith [plaintiff's] history, he present[ed] a significant ... risk of not being able to perform the lifting and carrying functions which are essential duties for fighting a fire or performing a rescue operation. A significant part of the job of being a firefighter is the ability to lift heavy objects in an emergency in frequently very awkward and unstable circumstances ... I would not be confident of his ability to do this either effectively or safely.

Dr. Allan also concluded that plaintiff was susceptible to re-injuring his back, that the risk was significant, and that the risk would be present throughout his career. Finally, Dr. Allan recognized that if such a potentially incapacitating re-injury were to strike plaintiff during a rescue attempt, the outcome would likely be tragic.[9] Finding these risks

---

7. The duties of an Arlington County Firefighter, which are not disputed in this record, were described in some detail by Captain Jerome Smith. According to Captain Smith, firefighters must be capable of carrying heavy equipment such as ladders, forcible entry tools and smoke ejectors, and must be able to pull 100 pound hoses off of trucks and drag them to hydrants. The job can also involve the rescue of victims, sometimes requiring that victims be carried off roofs, out of windows, or down ladders. All of these activities involve heavy lifting from awkward positions. Further, while firefighters generally work in teams, they may not have the benefit of assistance in any given rescue. There are documented incidents in the County where firefighters have had to carry victims weighing approximately two hundred or more pounds out of fire scenes without the assistance of a partner.

Additionally, the County's firefighters also work as emergency medical technicians ("EMTs"). All firefighters are cross-trained to perform both duties and must be capable of performing either job at any time. In their work as EMTs, the County's firefighters are exposed to similar physical demands, and may have to lift victims out of cars, or carry them, unassisted, out of buildings.

8. The County's Medical Standards, used by Dr. Hedlund to evaluate plaintiff's fitness for the position, are based on a landmark study done by San Bernardino County with assistance from the federal government. Information from the Department of Labor and the National Institute of Occupational Safety and health were used in the preparation of the San Bernadino study. The standards identify certain musculoskeletal conditions that are generally unacceptable for firefighters, including previous back surgery.

9. Dr. Hedlund also discussed her concerns regarding plaintiff with Ms. Margaret Walters, the Division Chief for Employee/Management/Retir-

to be unacceptable, the County informed plaintiff that he would not be hired for the position of firefighter because of his history of herniated discs and spinal stenosis.

The plaintiff filed a timely charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). After the EEOC unsuccessfully attempted to conciliate the dispute, plaintiff received a Right to Sue Notice, and filed this suit in a timely fashion on January 31, 1997. The complaint alleges that the County of Arlington engaged in unlawful discrimination in violation of the ADA, and prays for declaratory relief, injunctive relief, and damages to redress the alleged deprivation of his rights.

## II.

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. This standard is met where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A "mere scintilla" of evidence, however, is not enough. To the contrary, when viewed in the light most favorable to the non-moving party, the evidence must be sufficient for a reasonable jury to find in favor of that party, given the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## III.

■ The ADA makes it unlawful to "discriminate against a qualified individual with a disability because of the disability of such

individual ..." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, plaintiff must prove that he (i) has a disability, (ii) is otherwise qualified for the job, and (iii) has experienced some adverse employment action as a result of his disability. *Doe v. University of Maryland Medical System Corp.*, 50 F.3d 1261, 1264–65 (4th Cir.1995). The threshold issue, then, is whether plaintiff has a "disability" cognizable under the Act. In this regard, it is important to note that plaintiff does not contend that he is disabled in any way. To the contrary, he asserts that he is physically able in all respects to perform all the duties of a firefighter and that he has demonstrated this ability by passing the County's tests. Nonetheless, plaintiff contends that he is entitled to the ADA's protection because the County regarded him as disabled when it denied him the firefighter position despite his demonstrated ability to perform a firefighter's duties.

■ The plaintiff is correct that the Act protects not just the actually disabled, but also those who are merely regarded as disabled. Indeed, the statutory definition of "disability" includes "being regarded as having [a physical or mental impairment that substantially limits one or more of the major life activities.]" *See* 42 U.S.C. § 12102(2)(C).[10] The provision reflects an acknowledgment that "society's accumulated myths and fears about disability ... are as handicapping as are the physical limitations that flow from actual impairment." *See School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987). While defining "disability" to include being regarded as disabled, the Act does not further define or specify the circumstances that might constitute being regarded as disabled. This is left to EEOC regulations,[11] which state that a person is

ee Services before a final decision was made. Walters agreed with Dr. Hedlund's assessment, and concluded that plaintiff's offer should be revoked considering his medical history and the fact that the rescue and lifting functions of the job are the quintessential duties of a firefighter.

**10.** The ADA defines the term "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual.
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.
42 U.S.C. § 12102(2).

**11.** The EEOC regulations, "while not controlling upon the courts by reason of their authority, do

"regarded as" having a substantially limiting impairment if the individual (1) has an impairment that does not substantially limit major life activities, but is treated by an employer as having such a limitation; (2) has an impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or (3) has no impairment, but is treated by an employer as having a substantially limiting impairment. *See* 29 C.F.R. § 1630.2(*l*); *Forrisi v. Bowen*, 794 F.2d 931 (4th Cir.1986) (citing the predecessor to § 1630.2(*l*)) [12] In the instant case, plaintiff's claim falls under the first definition, as his impairment is not substantially limiting,[13] but he alleges the County perceived it as such. So the question becomes whether the County treated plaintiff as having an impairment that limited his "major life activities." Working, of course, is a "major life activity," [14] and substantially limiting this activity, according to the regulations, "means significantly restrict[ing] ... the ability to perform either a class of jobs [15] or a broad range of jobs in various classes [16] as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Importantly, however, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

In limiting the coverage of the ADA to those individuals who are regarded by employers as unable to perform a class or broad range of jobs, the regulations sensibly and faithfully construe the Act, which is aimed at employment decisions based on myths or prejudices about disabilities or impairments. Pernicious myths and prejudices about disabilities often infect employment decisions where an employer regards an individual as having an impairment that renders him unsuited for a wide class or broad range of jobs. The same cannot be said of cases where, as here, an employer makes a decision by focusing sharply on whether there is a match between a particular job and an individual with an actual impairment, given the current state of medical knowledge about the impairment. Science, not myths and prejudices, underlie such a decision; it is a rational decision, not an irrational one. Put another way, the ADA seeks only to remedy perceived disabilities "that, like actual disabilities, extend beyond [the] ... isolated mismatch of [a particular] employer and employee." *Forrisi*, 794 F.2d at 935.

Analysis of whether the County regarded plaintiff as being substantially limited in performing either a "class of jobs or a broad range of jobs in various classes" properly begins with the County's perception of plaintiff's impairment and the resulting limitation

---

constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

**12.** While *Forrisi* involves a claim brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, the ADA defines a disability in substantially the same fashion as does the Rehabilitation Act. Accordingly, the same analysis applies to claims brought under both statutes. *See Doe*, 50 F.3d at 1264 n. 9.

**13.** But there is no doubt that plaintiff's back condition constitutes a "physical impairment" which the regulations broadly define as including any physiological condition affecting the neurological and musculoskeletal systems. *See* 29 C.F.R. § 1630.2(h)(1).

**14.** *See Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 349 (4th Cir.1996); 29 C.F.R. § 1630.2(i), defining "major life activities" to include "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

**15.** "Class of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B).

**16.** "Broad range of jobs in various classes" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(C).

on his ability to work.[17] The record, fairly characterized, reveals that the County viewed plaintiff as unsuited for the job of firefighter because it requires the ability to lift and carry objects, including people, which often weigh in excess of 100 pounds, while in awkward positions, and during emergency situations.[18] Thus, the County regarded plaintiff as unsuited for firefighting, and logically, all other jobs which would require the performance of similar tasks under similar conditions. There is nothing in the record to suggest, however, that the County actually considered plaintiff to be unsuited for other County positions.[19] And, considering the very unique and specialized demands required of a firefighter,[20] plaintiff's impairment, as perceived by the County, would not appear to disqualify him from any other jobs in general.

Indeed, the record does not reveal that plaintiff's perceived limitation would have disqualified him from any other County position.[21] Moreover, plaintiff does not attempt to show how many and which jobs he would be precluded from due to his perceived inability to safely perform the particular demands of a firefighter. Quite simply, few, if any, other jobs utilize or require the training, skills or abilities that are demanded of firefighters. While plaintiff argues that the County regarded him as incapable of performing any heavy labor position,[22] this characterization is not supported by the record. Owing to the extraordinary nature of the position in question, and the increased risk of injury for those who have had a history of herniated discs, the County simply regarded plaintiff as limited in his ability to perform as a firefighter. This fact, in turn, points persuasively to the conclusion that the County

**17.** *See Forrisi*, 794 F.2d at 934 (court must identify the degree to which an employer could consider an applicant's impairment to restrict his ability to work without, in the statutory sense, considering that impairment to be a substantial limitation); *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1444 (10th Cir.1996) (focus of the "regarded as" inquiry is on the impairment's effect upon the attitudes of the potential employer).

**18.** Further, there is ample evidence in the record to support the County's belief that firefighters may be required to perform such tasks. Edward Plaugher, Chief of the Fire Department, testified during his deposition that firefighters often have to carry victims by themselves. The Affidavit of Captain Jerome Smith chronicles several such incidents. In one, Smith was required to lift and carry an unconscious victim, weighing approximately 200 pounds, off a bed and out of a building while avoiding a large hole that had burned through the floor. In another, Smith and his partner were involved in a rooftop rescue of an unconscious victim when his partner, while attempting to place the victim on the ladder, hurt his back. In this circumstance, Smith was required to hold the victim against the ladder, while simultaneously preventing his injured partner from falling off the roof until help arrived.

**19.** Plaintiff argues to the contrary, contending that the County views the plaintiff as unable to perform any "lifting and carrying functions" generally. As such, plaintiff hypothesizes that the County potentially regards him as unsuited for jobs including furniture mover, construction worker, or any other job requiring heavy labor. Yet this characterization is unsupported by the record. The record reveals only that Dr. Allan,

given plaintiff's back history, viewed him as unable to safely perform the "lifting and carrying functions ... essential ... for fighting a fire or performing a rescue operation." This, more specifically, requires the "ability to lift heavy objects in an emergency in frequently very awkward and unstable conditions." Re-injury while performing such tasks "would render [plaintiff] immediately incapable of completing [the] crucial responsibilities of a firefighter." Thus, the record reflects the County's informed judgment based on medical evidence that plaintiff's back made him unsuited to perform safely the lifting activities of a firefighter.

**20.** As Arlington County firefighters also must work as emergency medical technicians, and are cross-trained to perform both duties, they are treated here as constituting one job.

**21.** It is noted that the County's Medical Standards indicate that a history of previous back surgery is also generally not an acceptable condition for police officers. Yet, the standards provide only a guideline, and according to Dr. Hedlund, each individual is individually assessed to determine their fitness for a particular job. Moreover, there is simply no evidence in the record that the County perceived plaintiff as unsuited to be a police officer on account of his back problems.

**22.** Plaintiff lists jobs including, furniture movers, construction workers, beer delivery drivers, mechanics, among others. Yet, while such jobs clearly require lifting, there is no record evidence, as one might expect, that such lifting is performed from unstable and awkward positions while under emergency conditions.

did not regard plaintiff, on account of his back condition, as unable to perform a "class of jobs or broad range of jobs in various classes." Rather, they perceived him as being precluded only from the position of firefighter. Accordingly, the County did not regard the plaintiff as disabled within the meaning of the ADA.

The Fifth Circuit reached precisely this conclusion in *Bridges v. City of Bossier*, 92 F.3d 329 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997). There, the city regarded that plaintiff's mild form of hemophilia to preclude him from those jobs, such as firefighter or EMT, involving "routine exposure to extreme trauma." *Id.* at 332. On these facts, the Fifth Circuit concluded that plaintiff had failed to show that the City regarded him as substantially limited in performing a "class of jobs" merely because they regarded him as unable to perform as a firefighter or municipal EMT. *Id.* at 336.[23] Rather, because such jobs constituted merely a narrow range of jobs, the Fifth Circuit concluded that one who is disqualified from holding such jobs is not disabled under the ADA. *Id. See also Welsh v. City of Tulsa, Okl.,* 977 F.2d 1415 (10th Cir.1992) (plaintiff not regarded as substantially limited where sensory deficit prevented him from becoming a firefighter); *but see Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1126 (11th Cir.1993) (assuming, *in dicta,* without discussion, that individuals precluded from firefighter positions due to skin condition would be substantially limited in major life activity).

■ The result reached in *Bridges* is sound, given the rationale for the ADA's definition of persons with a "disability" as including those who are regarded as having a disability. This rationale, simply put, is that the "myths and fears" surrounding disabilities are just as limiting in an individual's search for meaningful work as are the constraints imposed by actual disabilities. And it is "myths and fears," indeed the societal prejudices about disabled persons and disabilities that are at the heart of the ADA. Thus, pre-conceived perceptions about impairments which stem from such fears, and which work to foreclose opportunities in employment generally, may properly implicate the provisions of the Act. By contrast, the County's belief that plaintiff was unsuited for the particular demands of a firefighter was based on sound medical knowledge concerning plaintiff's impairment, and foreclosed only the position of firefighter.[24] Accordingly, in finding plaintiff unsuited for the particular demands of a firefighter, the County did not regard him as disabled within the meaning of the statute.[25]

## IV.

■ Plaintiff's inability to establish that he is "disabled" within the meaning of the Act is

---

**23.** In *Bridges,* as in the instant case, disqualification from the job of firefighter also acted as a disqualification from the job of EMT.

**24.** Though the Fourth Circuit has suggested that a plaintiff whose impairment is thought to "foreclose generally the type of employment involved" would be substantially limited, this does not conflict with the result reached here. *See Forrisi,* 794 F.2d at 935 (employee's fear of heights was not a substantial limitation on employability merely because it precluded one particular job in his field which required substantial climbing); *Gupton v. Com. of Va.,* 14 F.3d 203, 205 (4th Cir.1994) (employee's allergy to tobacco smoke did not substantially limit employment where employer provided a position at a smoke-free office). Specifically, the "foreclosed generally" test should not be read to imply that exclusion from one's chosen profession is always a substantial limitation on the ability to work. Otherwise, a relatively minor impairment, which might preclude employment in one highly spe-

cialized and demanding profession, without impairing one's employability generally, would necessarily constitute a disability under the Act. Such a result would be inconsistent with the regulations' attempt to limit the scope of the Act, and specifically, with their acknowledgment that "an individual is not substantially limited in working just because he or she is unable to perform a particular job for one employer, or because he or she is unable to perform a specialized job *or profession requiring extraordinary skill, prowess or talent.*" 29 C.F.R. Pt. 1630, App. § 1630.2(j) (emphasis added).

**25.** In reaching this conclusion, the Court does not in any way minimize the very real frustration and disappointment likely experienced by the plaintiff. Nor does the Court express any opinion as to the wisdom of the County's decision. It merely concludes that the County, in making its decision not to hire plaintiff, did not unlawfully discriminate against him on the basis of an impairment.

dispositive of his claim. Yet, it is also worth noting that under the ADA, only individuals who are "qualified" for the position in question may state a claim for discrimination. *Tyndall v. National Educ. Centers, Inc. of California,* 31 F.3d 209, 212 (4th Cir.1994). Thus, even if plaintiff were able to establish that he is "disabled" within the meaning of the ADA, that would not end the inquiry. To establish a prima facie case of discrimination under the Act, he must also show that he is "otherwise qualified for the employment in question." *Doe,* 50 F.3d at 1265. And, in this regard, an individual is not "otherwise qualified" for a position if he, "with or without reasonable accommodation, can[not] perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "essential functions" of the job are the "fundamental job duties of the employment position" in question. 29 C.F.R. § 1630.2(n); *See also Tyndall,* 31 F.3d at 213 (defining essential functions as those that bear more than a marginal relationship to the job at issue). Evidence relevant to whether or not a function is essential includes the employer's judgment, written job descriptions, the work experiences of current and former employees, the amount of time spent performing that function, and the consequences of not requiring the prospective employee to perform that function. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3).

According to the County, the ability to perform strenuous lifting activities, including the unassisted rescue of adult victims, is an essential function of a firefighter. This assertion is entitled to deference,[26] and finds considerable support in the record. The County's written description of the position warns that it "involves exposure to hazardous, dangerous, and physically demanding conditions including fires, accidents, rescues, injuries, and medical emergencies." Captain Smith's own experiences, which include the unassisted rescue of a 200 pound man from a burning building, confirm the accuracy of the County's judgment.[27] And clearly, potentially grave consequences may result in an emergency if a firefighter is unable to perform this vital function. It follows that the ability to perform such rescues is an essential function of the position.[28]

■ Further, it is evident that plaintiff cannot safely perform this essential function of the position.[29] His own physician noted that lifting 160–200 pounds would "place a large strain on [plaintiff's] back," and even

---

**26.** "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).

**27.** Nor are such rescues too rare to matter. The record includes Chief Plaugher's statement that County firefighters may be required to perform numerous unassisted rescues throughout a career.

**28.** Seeking to avoid this conclusion, plaintiff makes two arguments. First, he notes that County firefighters spend a relatively small amount of time performing this activity. Although true, the amount of time spent performing a function is only one factor in the determination, and must be considered in context. Here, the lifting and carrying of victims is an essential function of the position of firefighter because it is a task that must be performed whenever required, however infrequent that may be. *See Holbrook v. City of Alpharetta, Ga.,* 112 F.3d 1522, 1527 (11th Cir.1997) (finding even infrequently performed field work to be an essential function of a detective because it is necessary to ensure the collection of all evidence). Indeed, it is undisputed that actual firefighting and emergency medical services only constitute between

5% and 10% of a firefighter's work hours, yet it is also beyond doubt that these are the essential functions of the position.

Second, plaintiff argues that because the firefighter physical agility test only tests an applicant's ability to rescue a 125 pound person, the essential rescue function of the job is similarly limited to those circumstances. This argument is unpersuasive; the County sensibly and prudently tests at the lower weight, relying on physical examinations and medical judgments to determine whether an applicant can successfully carry out rescues at greater weights.

**29.** Moreover, neither party suggests, nor does there appear to be, a reasonable accommodation that would enable plaintiff to perform this function. Rather, due to plaintiff's impairment, the County would have to eliminate from his responsibilities the participation in emergency rescues that might require his lifting adult victims. Yet an accommodation such as this, that requires the elimination of an essential job function, is unreasonable and not required by the Act. *Johnson v. State of Md.,* 940 F.Supp. 873, 878 (D.Md.1996), *aff'd,* 113 F.3d 1232 (4th Cir.1997) (*citing Hall v. United States Postal Serv.,* 857 F.2d 1073, 1078 (6th Cir.1988)).

150 pounds would be "pushing the [safety] envelope." The record indicates that precisely this type of strain could trigger a second disc herniation, which might well instantly incapacitate plaintiff. Dr. McAdam's also stated that 200 pounds would be "prohibitive" for plaintiff. Clearly, it is not possible to predict the size or condition of a victim that a firefighter will have to rescue from an emergency. Because plaintiff cannot safely perform this essential function of a firefighter, he is not "otherwise qualified" for the position.[30]

## V.

The County of Arlington did not regard plaintiff as disabled within the meaning of the ADA merely because it considered him as unsuited for the particular demands of a firefighter. Moreover, plaintiff is unable to safely perform the essential functions of a firefighter. Accordingly, the plaintiff cannot establish a prima facie case under the ADA.

For the reasons here stated, an appropriate Order has issued.

---

**30.** Because the record points persuasively to the conclusion that plaintiff cannot perform an essential function of a firefighter, the question of whether plaintiff would pose a "direct threat" to the health or safety of others by virtue of his impairment, an alternative basis for finding plaintiff unqualified for the position, is not reached. *See Doe*, 50 F.3d at 1265 (an individual is not otherwise qualified for a position if by working he would pose a direct threat to the health or safety of others),