UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GORDON P. GASPER,
Plaintiff-Appellant,

v.

No. 97-1542

WILLIAM J. PERRY, Secretary, United
States Department of Defense,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge;
James C. Cacheris, Senior District Judge.
(CA-96-774-A)

Argued: June 2, 1998

Decided: July 2, 1998

Before HAMILTON and WILLIAMS, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Kathryn Mary Theresa McMahon, COLLIER, SHAN-
NON, RILL & SCOTT, P.L.L.C., Washington, D.C., for Appellant.
Jeri Kaylene Somers, Assistant United States Attorney, Alexandria,
Virginia, for Appellee. **ON BRIEF:** William Daniel Sullivan, COL-
LIER, SHANNON, RILL & SCOTT, P.L.L.C., Washington, D.C., for

Appellant. Helen F. Fahey, United States Attorney, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Gordon Gasper appeals the district court's grant of summary judgment to William J. Perry, Secretary of the United States Department of Defense (the Secretary), in this employment discrimination case arising out of the termination of Gasper's employment with the federal agency known as the Defense Mapping Agency (DMA).**1** Gasper alleges that his employment was terminated because of his disability in violation of the Rehabilitation Act of 1973 (the Rehabilitation Act), see 29 U.S.C. §§ 791, 794a. Because Gasper has failed to produce sufficient evidence from which a reasonable jury could conclude that his employment was terminated because of his disability, we affirm.

I.

In 1982, at the beginning of his senior year in college, Gasper was catastrophically injured in a motorcycle accident. As a result of the accident, Gasper has one blind eye, partial hearing loss, short-term memory dysfunction, and frontal lobe dysfunction. Gasper's frontal lobe dysfunction causes him to be impulsive, disinhibited, excessively loquacious, and to have difficulty reading social cues. As a result of these injuries, Gasper has significant difficulties relating to other people in social situations.

_____

**1** Since the termination of Gasper's employment, the DMA has been renamed the National Imagery and Mapping Agency. However, because both parties and the district court refer to the agency as the DMA, we will do the same.

2

On October 7, 1991, Gasper was hired as a cartographer at DMA's Brookmont, Maryland facility. At the time he was hired, Gasper provided DMA with medical documentation for all his disabilities. This documentation included references to Gasper's deficiencies in short-term memory, causing misinterpretation and confusion, and problems in social functioning, including "[i]nappropriate childlike behavior." (J.A. 149). During his tenure at DMA's Brookmont facility, Gasper performed his job satisfactorily.

In April 1993, Gasper was transferred to DMA's Reston, Virginia facility, where he continued in his position as cartographer. Initially, Gasper's supervisor was Martha Nelson, and according to Gasper, his performance evaluation during the time he was supervised by Nelson indicated satisfactory performance.

In February 1994, Marcia Weinland replaced Nelson as Gasper's immediate supervisor. John Doty was Gasper's second-level supervisor. Gasper stated in his affidavit that at the time Weinland replaced Nelson as his immediate supervisor, he advised Weinland of his disabilities.

Shortly after Weinland replaced Nelson as Gasper's supervisor, Gasper began having difficulties at DMA. The first disciplinary action against Gasper stemmed from a series of incidents that occurred between February 15 and 22, 1994. Prior to February 15, Gasper volunteered to clean and verify digital tape cartridges (DTCs) as part of the "DTC Verification Project." On February 14 and 15, Gasper was instructed on the proper use of the DTC winder cleaner and specifically instructed not to open the back of the machine. Despite these instructions, on the afternoon of February 15, Gasper was discovered tinkering with the inside of the DTC winder cleaner. In response, the Chief of the Systems Operation Division, Dennis Doherty, immediately spoke with Gasper and reminded him not to open the machine. However, on the evening of February 21, Gasper again opened the DTC winder cleaner, apparently in order to fix something he thought was wrong. A short time later, after maintenance personnel had corrected the first problem, Gasper was found for the third time opening the machine. According to Gasper, at least with respect to one of these incidents, one of the contractors had instructed him to "unjam" the DTC machine. As a result of these incidents, on February 25,

3

1994, Weinland issued Gasper a letter of reprimand for his failure to follow a supervisory directive and instructions in the use of government property.

The next incident occurred on March 8, 1994, when Susan Akard, a fellow DMA employee, was attempting to return to her office with a frozen yogurt cone. Upon seeing Akard, Gasper placed his arm across a doorway and told Akard she could not go through unless she gave him a lick of her cone. In response, Akard told Gasper that she had a cold and that he could not have any of her frozen yogurt. Akard also told Gasper that he should not be rude. According to Akard, Gasper responded that he did not care and repeated that she could not pass unless she gave him a lick of her cone. At that point, a man got off the elevator behind Gasper and Gasper had to release his arm to permit the man to pass into the hallway. Akard then followed the man through the door. However, Gasper continued to follow Akard, grabbing onto her arm and again stating that she could not go unless she gave him a lick of her cone. John Doty, Gasper's second-level supervisor, then appeared and gently pushed Gasper away from Akard so that she could go into her office. According to Akard, Gasper was "loud, scary, and threatening" during this incident, and she was very shaken as a result of it. (J.A. 124).

Akard stated in her affidavit that the frozen yogurt incident was not the first time she had been frightened by Gasper. Specifically, on a previous occasion, Akard had been in the elevator carrying a "duck head umbrella," when Gasper grabbed the umbrella, pointed the beak of the duck's head within two inches of Akard's eyes, and said, "quack, quack, quack." (J.A. 124, 157). Following the frozen yogurt incident, Akard reported both incidents to Weinland. When asked about the incidents during his deposition, Gasper stated that, with respect to the umbrella incident, he was trying to carry on a nice conversation with Akard, while his behavior with respect to the frozen yogurt cone was his polite way of preventing Akard from entering the hallway using Gasper's security code.

Weinland subsequently met with Gasper to discuss his behavior. During this conversation, Weinland explained to Gasper that his behavior toward Akard was inappropriate in that it included touching, invading another person's personal space, being loud and boisterous,

4

and insisting on having the last word. According to Weinland, Gasper agreed that his behavior may have had some unintended consequences, but he stated that others were too conscious of their personal space and that he had difficulty reading others' reactions. In addition, Gasper indicated that Akard's response was "melodramatic." (J.A. 158). At the conclusion of her conversation with Gasper, Weinland warned Gasper that she was considering disciplinary action against him "to impress upon him the importance of changing his behavior and to impress upon him the seriousness of the incident." Id.

Thereafter, on March 22, 1994, Weinland proposed a five-day suspension as a result of Gasper's inappropriate behavior. The proposed suspension was approved, and on April 21, 1994, Gasper was notified that he was suspended for five days, effective April 25, 1994.

Several additional incidents occurred between May and July 1994. The first, on May 26, 1994, involved Gasper's conduct toward a co-worker, Debra Hinrichs, during a reception following an awards ceremony. While Hinrichs was eating some refreshments with another co-worker, Gasper, whom Hinrichs had not previously met, approached her and began telling her how beautiful she was and that he believed that they must be soul mates because they were reflections of each other: she was beautiful, he was ugly; she had dark eyes, his were light; she was right-handed, he was left-handed; she was a woman, he was a man. In addition, during this conversation, Gasper knelt on the ground at Hinrichs' feet and begged her not ever to cut her long, beautiful hair. According to Hinrichs, she was not only embarrassed, but also, "a little afraid to have been singled out and noticed by [Gasper]." (J.A. 125). Some time after the incident, Gasper apologized to Hinrichs, while they were in the cafeteria, explaining that a motorcycle injury in college damaged his brain and made him unable to control what he said. However, Hinrichs stated that she "continued to be scared of [Gasper]." (J.A. 126). When questioned about the incident during his deposition, Gasper stated that he did not know Hinrichs at the time of the awards reception, that he thought she looked good that day, and that he was trying to keep the conversation going beyond simply "hello" or "goodbye." Gasper denied telling Hinrichs that they were "soul mates." (J.A. 119).

On June 30, 1994, two DMA employees observed Gasper speaking with a female aerobics instructor and standing by the driver's side of

5

her car. One of the employees, a DMA security specialist named Carol Oliver, stated that it appeared that Gasper had been blocking the instructor from getting into her car. Concerned that Gasper might be harassing the instructor, Oliver and the other employee observed the two for several minutes, at which time Oliver yelled to the pair that the instructor was probably getting tired and needed to go home. Oliver then yelled again, "Gordon, she has to go home." (J.A. 164). At that point, Gasper backed away. As the instructor drove past Oliver and her co-worker, they asked the instructor whether Gasper had been harassing her, to which she responded, "Yes." (J.A. 164-65). According to the employees, the instructor also stated that Gasper had been blocking her from getting into her vehicle.

The next incident occurred on July 5, 1994. On that day, Donna Gaskin, a contract employee working at DMA, entered the DMA Reston facility after an exercise run. Gasper, who was walking behind her, asked her if she was wearing a "racer-type" bra and inquired further as to what the advantages were to wearing that type of bra as compared to a regular bra. When Gaskin, turning away from him and entering her security number on the key paid, said,"It's comfortable," Gasper continued by asking whether it was the "front-clasp type." (J.A. 170). Gaskin then told Gasper that his questions were "too intimate and not appropriate" and walked into a nearby office so that Gasper would pass. According to Gaskin, she found Gasper's behavior "rude, intrusive, and somewhat harassing" and reported it to Carol Oliver. See id.

The final incident between May and July 1994 occurred on July 12, 1994. On that date, Carol Oliver, the security specialist who had witnessed Gasper apparently harassing the aerobics instructor two weeks before, observed Gasper standing close to an aerobics class in progress and watching. Oliver reported her observation to a security guard who escorted Gasper from the area. In response to the allegation that his conduct was inappropriate, Gasper stated that he was watching the aerobics class to decide whether he wanted to join the class.

On July 27, 1994, Weinland noted these incidents and her investigation into them. In her notes, Weinland indicated that she had spoken with Gasper concerning the incidents and that Gasper stated that he did not understand why the women he was accused of harassing

6

did not cut him off if they felt uncomfortable about a particular situation. Weinland concluded in her notes that Gasper"[did] not grasp what [was] appropriate behavior or conversation in a given situation" and was unable to "assess the situation in order to apply judgment." (J.A. 169).

Based upon these incidents, on August 27, 1994, Weinland proposed that Gasper be suspended for fourteen days for repeated inappropriate conduct toward female co-workers. In the proposed suspension, Weinland stated that in determining the disciplinary measure to be taken, she had considered Gasper's previous misconduct. In addition, Weinland stated that if Gasper had"personal problems of which [she was] unaware," she encouraged him to seek assistance from the Employee Assistance Program. (J.A. 173).

On September 7, 1994, Gasper was notified by Doty that the proposed suspension had been sustained. Thereafter, Gasper filed a grievance contesting the suspension. In response to the charges, Gasper denied that he had engaged in some of the inappropriate behavior alleged, but also suggested that one of the reasons for his behavior could be the phenobarbital he was taking nightly for the suppression of any neurologic seizures. In response, the deciding official, Robert Thibodeaux, denied Gasper's grievance, stating that if the phenobarbital was causing problems, Gasper should obtain a doctor's opinion, and that Gasper had repeatedly disregarded previous attempts to correct his disruptive and inappropriate behavior.

The final series of incidents occurred in November and December 1994. In November 1994, Weinland observed Gasper trying to place his classified computer diskette into her unclassified computer on two separate occasions. Both times, Weinland instructed Gasper not to use her unclassified computer for classified work. In addition, at a branch meeting on November 23, 1994, Gasper was again told not to use his classified disk in Weinland's computer. Weinland's computer was also identified as an unclassified computer by a form taped to the monitor. Nevertheless, on December 16, 1994, a co-worker, Karen Tabor, observed Gasper walk into Weinland's office with his classified disk to use Weinland's computer. Tabor reminded Gasper that he was not to use Weinland's computer and explained to Gasper that he

7

should only put his disk into a computer with a red sticker on it, indicating that it was for classified use.

A few days later, on December 19, Gasper again inserted his classified disk into Weinland's unclassified computer. During the subsequent security investigation, Gasper was unable to use his disk, and Weinland was unable to use her computer.**2** In his deposition, Gasper admitted putting his disk into Weinland's computer, but asserts that the other computers were occupied and another DMA employee, who outranked Gasper by several pay levels, told him that he should use Weinland's. In addition, in a statement form completed after the incident, Gasper stated that he put his disk into Weinland's computer because he had heard, "along the grapevine," that Weinland's computer had been returned to the classified level. (J.A. 183).

On February 14, 1995, Weinland proposed Gasper's termination for insubordination. In proposing his termination, Weinland referred specifically to Gasper's repeated failure to use only classified computers for his classified diskettes and his failure to follow specific directives from Weinland. In addition, Weinland stated that she had carefully considered Gasper's employment record, including the three prior disciplinary actions taken against him since February 1994.

With respect to whether she ever attempted to accommodate the effect of Gasper's disability on his short-term memory and his ability to behave in socially appropriate ways, Weinland stated during her deposition that she regularly repeated answers to the same questions posed by Gasper and she often gave Gasper written instructions, particularly if he asked a question late in the day that pertained to a task he would have to work on the next day. Weinland also stated that Gasper frequently took his own notes. With respect to Gasper's interactions with co-workers, Weinland stated that she attempted to get other employees to stop joking about Gasper and to learn to respond to his inappropriate conduct by quickly cutting him off. However, there were a number of people who feared hurting Gasper's feelings and had difficulty asserting themselves with Gasper. Finally, Weinland stated that Gasper never requested any particular accommodation

_____

**2** The record does not indicate how long this investigation took or how long Weinland was deprived of the use of her computer.

8

from her and never raised the issue of his disability until after his termination, with the exception of his statement that his use of the phenobarbital might be affecting his behavior.

On March 28, 1995, Gasper was removed from federal employment. Gasper's second-level supervisor, John Doty, stated in his affidavit that Gasper was terminated for insubordination and a history of disciplinary problems. With respect to transferring Gasper to another DMA facility, Doty stated that such an accommodation was not reasonable because "Gasper had repeated behavior problems and his work performance was questionable." (J.A. 94).

On May 30, 1995, Gasper filed an EEO complaint claiming discrimination on the basis of a handicap. The Department of Defense Office of Complaint Investigations investigated Gasper's complaint and found that it was not substantiated.

On June 4, 1996, Gasper filed this action in the United States District Court for the Eastern District of Virginia against the Secretary, alleging that his termination was in violation of the Rehabilitation Act of 1973 (the Rehabilitation Act), see 29 U.S.C. §§ 791, 794a. In addition to his Rehabilitation Act claim, Gasper asserted causes of action under the Americans with Disabilities Act (ADA), see 42 U.S.C. § 12112; Title VII of the Civil Rights Act of 1964, see id. § 2000e-16; Title I of the Civil Rights Act of 1991, see id. § 1981a(a)(2); 42 U.S.C. § 1985; and 5 U.S.C. §§ 551, 7503, 7513, 2302(b)(1)(D). By order dated September 6, 1996, the district court dismissed Gasper's ADA claims.

Following discovery, on January 15, 1997, the Secretary filed a motion for summary judgment, and on February 5, 1997, Gasper filed a cross-motion for partial summary judgment on the issues of the Secretary's liability under the Rehabilitation Act and Gasper's right to reinstatement.

On February 10, 1997, the district court entered a memorandum opinion and order granting the Secretary's motion for summary judgment and denying Gasper's motion for partial summary judgment. Although the district court addressed only Gasper's claims under the

9

Rehabilitation Act in its memorandum opinion, it entered judgment in favor of the Secretary as to each of Gasper's claims.

Gasper noted a timely appeal. Despite the allegations in the complaint asserting violations of numerous federal statutes, on appeal, Gasper argues only that the district court erred in holding that he had failed to establish a claim under the Rehabilitation Act.

II.

We review a district court's grant of summary judgment de novo. See Karpel v. Inova Health Sys. Servs., 134 F.2d 1222, 1226 (4th Cir. 1998). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, 135 F.3d 275, 284 (4th Cir. 1998).

Section 504 of the Rehabilitation Act provides that"[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). In order to establish a violation of this provision, a plaintiff must prove: (1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit on the basis of the disability. See Doe v. University of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995). Although an employee may not be terminated because of his disability, we have previously recognized that a handicapped employee is not protected from discipline or termination as a result of misconduct, even if that misconduct is related to the disability. See Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n.3 (4th Cir. 1997) ("[M]isconduct--even misconduct related to a disability--is not itself a disability, and an employer is free to fire an employee on that basis."); Little v. Federal Bureau of Investigation, 1 F.3d 255, 259 (4th Cir. 1993) ("[I]t is clear that an employer subject to the Rehabilitation Act must be permitted to terminate its employee on account of egregious misconduct, irrespective of whether the employee is handicapped.").

10

In this case, it is undisputed that Gasper suffered from a disability that impaired his short-term memory and his ability to judge the appropriate limits of social interaction. However, it is also undisputed that between February and December 1994, Gasper engaged in numerous instances of misconduct, ranging from a repeated failure to follow instructions to making inappropriate and offensive advances to female co-workers or other women at the DMA Reston facility. Although Gasper asserts that these instances of misconduct were caused by his disability, there is no evidence that the government terminated Gasper's employment because of his disability, rather than because of the misconduct, as asserted by the government. Specifically, Gasper's second-level supervisor, Doty, stated that he based his decision to terminate Gasper's employment on the fact that Gasper had failed, after repeated warnings, to follow specific instructions not to place his classified diskette into Weinland's unclassified computer, thus jeopardizing security, and the history of disciplinary problems Gasper had experienced since February 1994. Therefore, Doty justified the decision to terminate Gasper by relying not only on Gasper's failure to follow the instructions with respect to classified information, but also on Gasper's repeated misconduct in engaging in inappropriate behavior when interacting with others at the DMA facility. There simply is no evidence that Doty made the termination decision because of Gasper's disability, rather than because of this misconduct. Indeed, with the exception of raising the possibility that his medication was affecting his behavior, even Gasper failed to raise his disability as a potential cause of the misconduct until after his employment was terminated.

We note that several courts, including this court, have refused to recognize a cause of action for employment discrimination on the basis of the plaintiff's disability, where the plaintiff's employment was terminated because of misconduct allegedly related to the plaintiff's disability. For example, in Little, we held that the plaintiff had not stated a claim for disability discrimination where the plaintiff was terminated for being intoxicated on the job, misconduct the plaintiff argued was caused by his alcoholism, a disability. See Little, 1 F.3d at 258-59. Although we recognized that alcoholism is a disability for purposes of the Rehabilitation Act, we also recognized that "the [Rehabilitation] Act does not protect alcoholics or drug addicts from the consequences of their misconduct." Id. at 258.

11

Similarly, in Newland v. Dalton, 81 F.3d 904 (9th Cir. 1995), the Ninth Circuit held that the plaintiff's complaint alleging disability discrimination was properly dismissed, where a civilian employee of the United States Navy was dismissed after a "drunken rampage," during which he attempted to fire an assault rifle at individuals in a bar. See id. at 905-06. The Newland court held that regardless of whether the plaintiff's misconduct was related to his alcoholism, a recognized disability under the Rehabilitation Act, "a termination based on misconduct rather than the disability itself was valid." Id. at 906; see also Williams v. Widnall, 79 F.3d 1003, 1007 (10th Cir. 1996) ("We cannot adopt an interpretation of the [Rehabilitation Act] which would require an employer to accept egregious behavior by an alcoholic employee when that same behavior, exhibited by a nondisabled employee, would require termination."); Maddox v. University of Tenn., 62 F.3d 843, 847 (6th Cir. 1995) (rejecting alcoholic plaintiff's claims under the Rehabilitation Act and stating that in ruling against the plaintiff, the district court "correctly focused on the distinction between discharging someone for unacceptable misconduct and discharging someone because of the disability").

While the cases cited above involved more egregious misconduct than that for which Gasper was terminated in this case, the principle that an employer may terminate an employee for misconduct, even if that misconduct is allegedly related to the employee's disability, applies in these circumstances as well. In each case, the employee argued that the misconduct in which he had engaged was caused by his disability and, therefore, the employer discriminated against him on the basis of his disability when he was terminated for that misconduct. Nevertheless, this argument was squarely rejected. Gasper's argument in this case is the same as that rejected in those cases. Specifically, Gasper argues that it was his disability that caused each of the incidents for which he was disciplined and that because he was terminated for misconduct caused by his disability, he was terminated "because of" his disability. Because termination based on misconduct is not the equivalent of termination based on a person's disability, and because the undisputed evidence in this case indicates that Gasper was terminated because of misconduct and not because of his disability, the district court did not err in granting summary judgment to the Secretary as to Gasper's Rehabilitation Act claim.

12

III.

Accordingly, we affirm the district court's grant of summary judgment to the Secretary as to Gasper's claim of unlawful termination in violation of the Rehabilitation Act.

AFFIRMED

13