WYNN, Circuit Judge,
concurring in part and dissenting in part:
Towson University (“Towson”) decided that Gavin Class, a student who had suf *253 fered a serious heatstroke, could no longer safely participate in its Division I football program. Class challenged this decision under the Americans with Disabilities Act (“ADA”) and the Rehabilitation Act. The key question we must answer is what level of deference the district court should have applied in evaluating whether Towson discriminated against Class on account of his alleged disability.
The majority opinion and I agree that the district court applied the wrong standard in evaluating Towson’s decision. The Team Physician’s medical determination that Class faced too great a risk of serious injury or death to fully participate in Tow-son’s football program was entitled to some deference. We all agree that the district' court should have reviewed Dr. Kindschi’s opinion to determine if it was individualized, reasonably made, and based upon competent medical evidence. In my view, however, the touchstone of this inquiry should be the objective reasonableness of the university’s decision — not the subjective good faith of the Team Physician, as the majority opinion suggests.
Further, I cannot support applying the appropriate standard for the first time here on appeal. Instead, the proper course of action is to remand the case, so that the district court may make factual findings in accordance with the correct standard of deference. Therefore, I respectfully concur in part and dissent in part.
I.
At the heart of this case is the appropriate level of deference that we should accord to Towsoris decision that Class could no longer safely participate in its football program. I thus address that issue first.
Class’s claims arise under two similar provisions of law: the ADA and the Rehabilitation Act. Under Title II of the ADA, “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity.” 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act imposes the same prohibition on “any program or activity receiving Federal financial assistance.” 29 U.S.C. § 794(a).[1]
Under the ADA, a disabled person is otherwise qualified to participate in a program if he is “an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ... meets the essential eligibility requirements for ... participation in” that program. 42 U.S.C. § 12131(2); see 45 C.F.R. § 84.3(Z )(3), (4) (stating a nearly identical standard applicable to Rehabilitation Act claims).
In my view, the essential eligibility requirement at issue here is the ability to play football without an unacceptable risk to the player’s health and safety. See Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir.1995) (“[A]n individual is not otherwise qualified if he poses a significant risk to the health or safety of others.”). I therefore disagree with the majority opinion’s conclusion that “Towson University’s requirement that a student-athlete obtain the Team Physician’s clearance before returning from injury is legitimately an essential eligibility requirement.” Ante, at 247. It is inconsistent with the ADA to elevate the unilateral approval of the entity accused of discrimination to the status of an essential eligibili *254 ty requirement, as the majority opinion does here.[2] Dr. Kindschi determined whether Class met the pertinent essential eligibility requirement — Class’s ability to play football without an unacceptable risk to his health and safety; her determination itself was not the essential eligibility requirement.[3]
With the appropriate essential eligibility requirement in mind, I turn to the standard that the district court should have applied in evaluating Dr. Kindschi’s opinion. My review of the relevant ADA and Rehabilitation Act case law convinces me that Dr. Kindschi’s opinion should have been reviewed for objective reasonableness, in contrast to the majority opinion’s more subjective approach.
The majority opinion relies heavily on Halpem, in which a student with Attention Deficit Hyperactivity Disorder and an anxiety disorder challenged his medical school’s decision to dismiss him from the school for repeatedly exhibiting unprofessional behavior. 669 F.3d at 456-57. In that case, this Court afforded “great respect” to the school’s “professional judgments” regarding the student’s qualifications to continue in the Doctor of Medicine program. Id. at 463. In doing so, we noted that in the due process context, “the Supreme Court has held that a court should defer to a school’s professional judgment regarding a student’s academic or professional qualifications.” Id. at 462-63 (citing Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), and Bd. of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)). This deference was warranted “because courts are particularly ill-equipped to evaluate academic performance.” Id. at 463 (quoting Davis v. Univ. of N.C., 263 F.3d 95, 102 (4th Cir.2001)); see also Horowitz, 435 U.S. at 92, 98 S.Ct. 948.
The majority opinion cited Halpem throughout its opinion, without recognizing that Halpem is readily distinguishable from this case. Halpem involved a determination of academic qualifications, which is different in kind from a determination of physical qualifications. Academic eligibility is not determined through science, but through individual judgments that necessarily involve some level of subjectivity and discretion. See Ewing, 474 U.S. at 225 n. 11, 106 S.Ct. 507; Horowitz, 435 U.S. at 90, 98 S.Ct. 948. Academic eligibility decisions are “not readily adapted to the procedural tools of judicial or administrative decisionmaking” because there are few objective standards for the courts to apply. Horowitz, 435 U.S. at 90, 98 S.Ct. 948. In contrast, courts can assess medical determinations with an objective test that looks to the medical facts supporting the entity’s decision. See Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 288, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); Doe, 50 F.3d at 1265.
*255 In Arline, for instance, the Supreme Court considered whether a public school violated Section 504 of the Rehabilitation Act — one of the same provisions relied upon by Class — when it discharged a teacher who suffered from tuberculosis. 480 U.S. at 275-76, 107 S.Ct. 1123. The Court held that to determine whether the teacher posed a significant risk to the health and safety of others, the district court must make
[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk ..., (b) the duration of the risk ..., (c) the severity of the risk ... and (d) the probabilities the disease will be transmitted.
Id. at 288, 107 S.Ct. 1123 (alteration in original). Such an inquiry is essential to the Rehabilitation Act’s “goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear.” Id. at 287, 107 S.Ct. 1123.
Three years after the Supreme Court decided Arline, Congress passed the ADA, which expressly provides that an employer can decide that a disabled individual is unqualified if he or she “pose[s] a direct threat to the health or safety of other individuals in the workplace.” Americans with Disabilities Act of 1990, Pub.L. No. 101-336, § 103(b), 104 Stat. 327, 334 (1990) (codified as amended at 42 U.S.C. § 12113(b)). Congress has incorporated similar “direct threat” provisions in other sections of the ADA and in the Rehabilitation Act. See 42 U.S.C. § 12182(b)(3) (applying to places of public accommodation under Title III of the ADA); 29 U.S.C. § 705(20)(D) (excluding those who “constitute a direct threat to the health or safety of other individuals” from the definition of “individual with a disability” under the Rehabilitation Act).
In a case arising out of the direct threat provision of Title III of the ADA, Bragdon v. Abbott, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), a dentist refused to provide his standard services to a patient because she was infected with the human immunodeficiency virus. Id. at 628-29, 118 S.Ct. 2196. The Supreme Court considered whether it owed deference to the dentist’s determination that the patient posed a direct threat to his health and safety, particularly in light of the fact that he was a health care professional. Id. at 648, 118 S.Ct. 2196. The Supreme Court held that it “should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments.” Id. at 650, 118 S.Ct. 2196 (emphasis added). The Court explained:
As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability.
Id. at 649, 118 S.Ct. 2196 (emphasis added).
In the employment context, a similar standard applies when an employer decides whether a disabled employee poses a direct threat to his or her own health and safety. See 29 C.F.R. § 1630.2(r). In such cases, the employer must perform an individualized assessment of the employee’s ability to safely perform the job, “based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.” Id.; see also Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 86, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (applying this standard). Several employment cases have reviewed medical deter- *256 initiations for “objective reasonableness,” just as the Supreme Court did in Bragdon. See, e.g., Rodriguez v. ConAgra Grocery Prods. Co., 436 F.3d 468, 484 (5th Cir.2006); Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 31-32 (1st Cir.2002); Holiday v. City of Chattanooga, 206 F.3d 637, 645 (6th Cir.2000).
The Seventh Circuit applied a similar objective evidence standard in Knapp v. Northwestern University, 101 F.3d 473, 485-86 (7th Cir.1996), a case on all fours with this one. In Knapp, the Seventh Circuit considered whether Northwestern University violated the Rehabilitation Act by banning a student from playing varsity basketball because he had a potentially fatal heart defect. Id. at 476. The Seventh Circuit held that “medical determinations of this sort are best left to team doctors and universities as long as they are made with reason and rationality and with full regard to possible and reasonable accommodations.” Id. at 484. The court explained that in cases of this nature, “the court’s place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence.” Id. at 485.
Notably, Northwestern University’s determination did not need to be “the right decision” or the only reasonable conclusion. Id. Indeed, physicians might reasonably reach different medical conclusions, and “all universities need not evaluate risk the same way.” Id. The Seventh Circuit simply ensured that the university’s opinion was “based on objective evidence,” id. at 486, with an eye to the Arline factors regarding determinations made in medical risk cases, id. at 485 (quoting Arline, 480 U.S. at 287-88, 107 S.Ct. 1123).[4]
The Knapp court adopted the correct approach to eligibility decisions in university athletics. The majority opinion purports to adopt the Knapp standard, and to the extent that it does, I concur. However, the majority opinion underemphasizes the need for such decisions to be based on objective evidence and supported by competent medical knowledge. Id. at 486; see also Bragdon, 524 U.S. at 649-50, 118 S.Ct. 2196. The majority opinion instead considers whether Towson’s decision not to allow Class to play football “was a good-faith application” of Towson’s Return-to-Play policy, which implies that the subjective intent of the Team Physician is a key factor. Ante, at 247-48. But just as the Supreme Court made clear in Bragdon, subjective good faith will not relieve Tow-son of liability if its decision was not objectively reasonable. 524 U.S. at 649-50, 118 S.Ct. 2196. Following the guidance of the cases interpreting the direct threat provisions, we should take a rigorous look at the medical basis and objective reasonableness of Towson’s decision, in light of then-current medical knowledge. See Echazabal, 536 U.S. at 86, 122 S.Ct. 2045; Bragdon, 524 U.S. at 649, 118 S.Ct. 2196; Arline, 480 U.S. at 288, 107 S.Ct. 1123.
Having an objective standard is particularly important to avoid the paternalism toward disabled individuals that the ADA is intended to combat. 42 U.S.C. § 12101(a)(5) (“[Ijndividuals with disabilities continually encounter various forms of discrimination, including ... overprotective rules and policies.”); Echazabal, 536 U.S. at 85, 122 S.Ct. 2045 (“Congress had paternalism in its sights when it passed the ADA.”). Paternalism is particularly likely to emerge in questions involving the *257 health and safety of disabled individuals. While-universities might subjectively mean well when they find that it is too risky for a disabled person to participate in athletics, that good-faith intention could mask paternalism and stereotypes about those with disabilities. As stated in Knwpp, the law “prohibits authorities from deciding without significant medical support that certain activities are too risky for a disabled person. Decisions of this sort cannot rest on paternalistic concerns.” 101 F.3d at 485-86.
In sum, I agree with the majority opinion that Towson’s decision should be accorded deference, as long as its conclusion was reasonable, individualized, based on competent medical knowledge, and consistent with Towson’s statutory duty to make reasonable accommodations for disabled students. Such a review requires the court to take a close look at the objective medical evidence supporting the university’s views, and not just the good-faith intention of the university medical staff. Deference in this context is emphatically not a rubber stamp, but rather a willingness to respect the university’s judgment if it is medically and objectively reasonable.
II.
The majority opinion correctly concludes that the district court failed to apply the correct standard. Instead of assessing Dr. Kindschi’s opinion for objective reasonableness, the district court weighed the testimony of Dr. Kindsehi against the testimony of Drs. Casa and Hutson, and found Class’s experts to be more “persuasive.” Class v. Towson Univ., No. RDB-15-1544, — F.Supp.3d -, -, 2015 WL 4423501, at *8 (D.Md. July 17, 2015). In substituting Towson’s judgment with its own, the district court erred. The majority opinion chose to apply the deferential standard to this case, for the first time, on appeal. I, on the other hand, would remand the case to the district court.
When the district court applies the wrong legal standard, the best course is generally to remand the case and allow “the trier of fact to re-examine the record in light of the proper legal standard.” Kelley v. S. Pac. Co., 419 U.S. 318, 332, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974); see also Humphrey v. Humphrey, 434 F.3d 243, 247 (4th Cir.2006). Only when “the record permits only one resolution of the factual issue” is remand .unnecessary. Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); see also Humphrey, 434 F.3d at 248 (providing as an example that “an appellate court may resolve the case without remanding if the evidence would inevitably produce the same outcome under the correct standard”). When this case is viewed in its entirety, the record does not compel a conclusion either way regarding whether Dr. Kindschi’s decision was individualized, reasonably made, and based upon competent medical evidence. Remand is, thus, the appropriate route to take.
In holding otherwise, the majority opinion bends key aspects of the factual record. Two particular mischaracterizations illustrate my concern.
First, the majority opinion mischaracter-izes the results of heat-tolerance testing conducted by the Korey Stringer Institute (“Institute”). The majority opinion concludes that the Institute’s “test reports indicate that the heatstroke risk really has not been demonstrably abated” and cites the test results as support for Dr. Kinds-chi’s decision not to allow Class to return to Towson’s football program. Ante, at 249. However, Dr. Casa, the head of the Institute and a leading expert in heatstroke, looked at these same test results and found that Class’s performance was “stellar” and “better than almost any ath *258 lete [he] would even pull off the streets.” J.A. 302. Relying upon the test results, Dr. Casa concluded that “without question” it was reasonably safe for Class to participate in Towson’s football program. J.A. 297.
Towson sought out the Institute to measure Class’s ability to thermoregulate, and Towson paid for the three tests that the Institute conducted. The third test, performed in June 2015, was the key test for assessing Class’s ability to return to football, since the Institute designed the test to “mimic [the] intensity of what would happen during a football practice” in a hot environment. J.A. 302. By calculating the typical exertion of a collegiate lineman during a preseason practice, the Institute determined that Class would successfully complete the test by running 1.6 miles in nineteen minutes. If Class wished to do more than this, the test would continue for “up to a 1 hour duration.” J.A. 600. Class decisively passed this test and “did demonstrate the ability to thermoregulate.” J.A. 601. In fact, he was able to ran 4.25 miles in fifty minutes, meaning he completed “2.7 times (265%) the estimated workload necessary for the defined passing requirements.” J.A. 601. The only reason Class did not complete sixty minutes of exercise was muscle fatigue, not a failure to thermoregulate. Nonetheless, in summarizing the results of this test, the majority opinion simply states that “Class was able to perform for only 50 minutes of the scheduled 60-min-ute test.” Ante, at 249. This implies that Class failed the test — which he did not— and that he failed because he could not thermoregulate — which is untrue.
Second, the majority opinion miseharac-terizes the record to create factual support for Dr. Kindschi’s conclusion that the Cor-Temp system could not prevent Class from suffering another heatstroke. Under the standard we adopt today, Dr. Kindschi’s conclusion must be supported by “competent medical evidence.” Ante, at 247 (quoting Knapp, 101 F.3d at 485). Dr. Kindschi pointed to no literature supporting her medical conclusions, including her claim that a player could still overheat while the CorTemp system was in use. In fact, Dr. Casa testified that a player’s internal temperature could only go up by about one degree in a five to ten minute period, and Class could be removed from play and cooled down before reaching temperatures that are “anywhere near a heatstroke.” J.A. 311. Dr. Casa recommended that Class be cooled down if he reached an internal temperature of 103 degrees Fahrenheit, but noted that this threshold was very conservative. Dr. Kindschi did not point to any medical evidence supporting her decision to completely discount the conclusion of Dr. Casa, a leading heat-illness expert.
The majority opinion also notes that dozens of athletes have died from heatstroke, and cites this fact as support for Dr. Kindschi’s conclusion that Class would not be safe. Ante, at 251. However, there is no evidence in the record that anyone has ever suffered heatstroke while being monitored with the CorTemp system, which is used by numerous universities and NFL teams. As Dr. Casa testified: “[i]f he’s using the system, actually, [Class] would be the safest person on the football field because he’s the one person who then could not overheat during practice.” J.A. 310. Without any medical evidence supporting her opinion, the record does not compel the conclusion that Dr. Kindschi’s opinion on the effectiveness of the Cor-Temp system was objectively reasonable.
In pointing out the majority opinion’s mischaracterizations of the record, I do not mean to suggest that Dr. Kindschi’s opin *259 ion was not objectively reasonable. Perhaps it was. I merely underscore that the record is less clear than the majority opinion portrays and does not compel the conclusion that Dr. Kindschi’s determination should be upheld. Therefore, the proper remedy is to vacate and remand this case to the district court for consideration of whether Dr. Kindschi’s decision was individualized, objectively reasonable, and supported by competent medical evidence.
III.
In sum, the majority opinion aptly recognizes that Gavin Class is “a courageous man of substantial character, which is much to be admired.” Ante, at 252. And I agree with the majority opinion that the district court failed to apply the proper standard when assessing Dr. Kindschi’s decision.
But the majority opinion places too great an emphasis on Dr. Kindschi’s subjective intent, and not enough emphasis on the objective reasonableness of her medical opinion. And, the majority opinion makes its own factual findings instead of remanding to allow the district court to make factual findings under the correct standard in the first instance. For those reasons, I believe Gavin Class is entitled to more than being “proud to tell his story.” Ante, at 252. Accordingly, I respectfully concur in part and dissent in part.

. As the majority opinion notes, the ADA and the Rehabilitation Act are essentially the same in all aspects relevant to this opinion. See ante, at 244 n. 2. Accordingly, for the sake of simplicity, I refer solely to the ADA in some portions of this opinion.

. For example, in Halpern v. Wake Forest University Health Sciences, 669 F.3d 454, 463 (4th Cir.2012), the Court found that professionalism was an essential eligibility requirement for participation in a medical school program. The Court, however, did not frame the eligibility requirement as the medical school's decision that a student was professional, but instead looked to whether the student in fact possessed that trait.

. In fact, the majority opinion’s own analysis betrays its claim that Dr..Kindschi’s approval was an essential requirement for the program. Class admitted that Towson did not grant him clearance to play. This admission alone would defeat his claim if the clearance decision itself was an essential eligibility requirement, as the majority opinion purports. The majority opinion, however, did not end its analysis there — perhaps realizing that such a circular requirement does not comport with the ADA.

. Knapp was decided before Bragdon and thus did not rely upon Bragdon's objective reasonableness language.